UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

FILED

2008 JUL 24 P 4: 23

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| ADAMS FAMILY TRUST, ELNA ADAMS, TRUSTEE and KEVIN TASHJIAN, Derivatively on Behalf of Nominal Defendant FEDERAL HOME LOAN MORTGAGE CORPORATION, <br><br> Plaintiffs, <br><br> vs. <br><br> RICHARD F. SYRON, PATRICIA COOK, ANTHONY PISZEL, EUGENE M. MCQUADE, KARL GOETZ, STEPHEN A. ROSS, SHAUN F. O'MALLEY, ROBERT R. GLAUBER, BARBARA T. ALEXANDER, MARTIN F. BAUMANN WILLIAM M. LEWIS, JR., JEFFREY M. PEEK, GEOFFREY T. BOISI, RONALD F. POE, MIKE PERLMAN, KIRK S. DIE, JAMES R. EGAN, PAUL G. GEORGE, MICHAEL MAY, HOLLIS S. MCLOUGHLIN, PAUL E. MULLINGS, ANURAG SAKSENA, JERRY WEISS, RALPH F. BOYD, JR., JOSEPH A. SMIALWOSKI, ROBERT Y. TSIEN, ROBERT E. BOSTROM, MICHELLE ENGLER, THOMAS S. JOHNSON, NICHOLAS P. RETSINAS and JEROME P. KENNEY, <br><br> Defendants, <br><br> and <br><br> FEDERAL HOME LOAN MORTGAGE CORPORATION, <br><br> Nominal Defendant. | Case No. 1:08 CV 773 CMH/TRJ <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT <br><br><br> JURY TRIAL DEMANDED |

## NATURE AND SUMMARY OF ACTION

1.    This is a shareholder's derivative action brought for the benefit of nominal

defendant Federal Home Loan Mortgage Corporation ("Freddie Mac" or the "Company") against certain members of its Board of Directors (the "Board") and certain executive officers seeking to remedy the massive financial losses to the Company resulting from the Individual Defendants' (defined herein) breaches of their fiduciary duties.

2.      The Individual Defendants breached their fiduciary duties by, among other things: (i) knowingly failing to implement sufficient risk management controls to protect the Company from acquiring billions of dollars worth of mortgages with lax or non-existent underwriting standards; (ii) knowingly failing to implement and/or maintain adequate controls to ensure property appraisals underlying mortgages were done appropriately, and to prevent collusion between lenders, appraisers and rating agencies; (iii) knowingly failing to implement and/or maintain sufficient risk management controls to protect the Company from guaranteeing billions of dollars worth of sub-prime mortgages; (iv) knowingly failing to implement and/or maintain sufficient internal controls capable of managing, identifying and guarding against losses associated with the Company's investments and loan guarantees; (v) knowingly failing to implement and/or maintain adequate financial reporting controls; (vi) knowingly failing to adequately reserve for uncollectible loans and other risks of loss; (vii) knowingly making false and misleading statements or material omissions to the Company's stockholders and the public regarding Freddie Mac's financial exposure to the sub-prime mortgage market; (viii) knowingly making false and misleading statements or material omissions to the Company's stockholders and the public regarding the strength of the Company's risk management and internal controls; (ix) knowingly failing to refrain from unjustly enriching themselves at the expense of the shareholders through their sale of stock based on material non-public information; and (x) despite the fact that the Individual Defendants knew, or should have known, that the sub-prime

mortgage industry was rife with abuse and conflicts of interest, they did nothing to strengthen the Company's underwriting standards, but instead knowingly used lax or non-existent underwriting processes through the application of its "Loan Prospector" to accept high-risk mortgages.

3.     The Individual Defendants' breaches of fiduciary duties are particularly heinous considering that Freddie Mac, while being a public stockholder-owned company, is a Government Sponsored Enterprise ("GSE"), established by Congressional Charter in 1970, and is therefore accorded a number of preferential treatments including, but not limited to, exemption from the registration and reporting requirements of the Securities Act of 1933 and the Securities Exchange Act of 1934.  As a result, Freddie Mac's Board and executive officers are required to comport themselves with the highest degree of integrity as delineated in the Company's Code of Conduct[1] which states "[a]s a shareholder-owned, government-sponsored enterprise, our obligation to uphold principles of ethical conduct is greater than that of other companies.  We have a position of public trust and must never compromise it. *Our conduct must always be above reproach.*"

4.     Instead, the Individual Defendants violated their fiduciary duties and as a result the Company has suffered enormous financial damages, which the Company only first began to disclose on November 20, 2007, months after the sub-prime crisis had begun to garner public attention.  Specifically, on November 20, 2007, Freddie Mac disclosed that the Company had $105.4 billion of securities backed by sub-prime mortgages and announced: (1) that the Company had lost $2 billion in the third quarter of 2007; (2) an additional provision for credit losses of $1.2 billion due to continuing deterioration of mortgage credit; and (3) a reduction in

---

[1] Freddie Mac employs two codes of conduct - (i) Code of Conduct for Members of Freddie Mac's Board of Directors and (ii) Code of Conduct for Employees.  Both codes of conduct contain virtually identical provisions with respect to the excerpts cited by Plaintiffs with some variation as tailored for their respective audiences.  As such, unless otherwise indicated, Plaintiffs' citation to the Code of Conduct refers to the Code of Conduct for Members of Freddie Mac's Board of Directors.

the fair value of assets attributable to stockholders of Freddie Mac of $8.1 billion. On this news, Freddie Mac's stock price plummeted – *falling approximately 29% in one day following the announcement* – from a closing price of $37.50 per share on November 19, 2007 to a closing price of $26.74 per share on November 20, 2007.

5.     Moreover, in contravention of their fiduciary duties, certain of the Individual Defendants, based on their knowledge of material non-public information regarding the Company, sold nearly 220,000 of their personally-held shares of Freddie Mac stock during the height of the sub-prime crisis garnering over $13.5 million in proceeds for their own personal benefit.

6.     The Individual Defendants' actions were in clear violation of their fiduciary duties and have caused severe damage to Freddie Mac's business, financial condition and reputation. On March 26, 2008, Plaintiff demanded that the Freddie Mac Board take action against its current and former members and executive officers of the Company to recover damages to the Company resulting from the Individual Defendants mismanagement and breach of fiduciary duties, but to date, the Board had done nothing to remedy the Individual Defendants' breaches of fiduciary duty.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1452(f)(2) which states that "all civil actions to which the Corporation is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions, without regard to amount or value." This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

8.     Venue is proper in this district because a substantial portion of the transactions

and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district. One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

9.      Plaintiffs Adams Family Trust, Elna Adams, Trustee and Kevin Tashjian are shareholders of Freddie Mac, were shareholders of Freddie Mac at the time of the wrongdoing alleged herein, and have been shareholders of Freddie Mac continuously since that time.

10.      Nominal Defendant Freddie Mac is a stockholder-owned company chartered by Congress in 1970, with its principal executive offices located at 8200 Jones Branch Drive, McLean, Virginia 22102. According to the Company's public filings, Freddie Mac's mission is to provide liquidity, stability and affordability in the U.S. housing market. Freddie Mac purchases residential mortgages and mortgage-related securities in the secondary mortgage market and securitizes them into mortgage-related securities that can be sold to investors.

11.      Defendant Richard F. Syron ("Syron") has served as Chairman of the Board and Chief Executive Officer of Freddie Mac since December 2003. From April 1, 2006 to June 5, 2007, Syron, based upon his knowledge of material non-public information regarding the Company, sold 65,660 shares of Freddie Mac common stock garnering proceeds of $4,273,750.96.

12.      Defendant Patricia L. Cook ("Cook") has served as Executive Vice President and Chief Business Officer of Freddie Mac since 2007. Prior to that, Defendant Cook served as Executive Vice President, Investments of Freddie Mac since joining the Company on August 2,

2004. From May 6, 2006 to August 2, 2007, Cook, based upon her knowledge of material non-public information regarding the Company, sold 22,185 shares of Freddie Mac common stock garnering proceeds of $1,412,032.30.

13.     Defendant Anthony Pizsel ("Piszel") has served as Executive Vice President and Chief Financial Officer of Freddie Mac since joining the Company in November 2006. On December 7, 2007, Pizsel, based upon his knowledge of material non-public information regarding the Company, sold 8,234 shares of Freddie Mac common stock garnering proceeds of $292,636.36.

14.     Defendant Eugene M. McQuade ("McQuade") was President and Chief Operating Officer of Freddie Mac from September 1, 2004 through September 1, 2007. McQuade also served as a director of the Company from September 2004 through September 2007. From May 6, 2006 to September 1, 2007, McQuade, based upon his knowledge of material non-public information regarding the Company, sold 47,509 shares of Freddie Mac common stock garnering proceeds of $3,034,051.17.

15.     Defendant Richard Karl Goeltz ("Goeltz") has served as a director of Freddie Mac since December 2003 and has served as Chairman of the Audit Committee of the Board (the "Audit Committee") since March 31, 2004, and as a member of the Finance and Capital Deployment of the Board (the "Finance Committee") and the Governance, Nominating and Risk Oversight Committee of the Board (the "Risk Oversight Committee") since at least March 31, 2004.

16.     Defendant Stephen A. Ross ("Ross") has served as a director of Freddie Mac since September 1998 and has served as a member of the Audit Committee since at least 2004, Chairman of the Finance Committee since 2005, and as a member of the Risk Oversight

Committee since at least 2005.

17.     Defendant Shaun F. O'Malley ("O'Malley") served as a director of Freddie Mac from March 2001 until June 6, 2008 and as Lead Director from 2003 to June 6, 2008. O'Malley also served as a member of the Audit Committee from at least 2004 to 2008, a member of the Compensation and Human Resources Committee of the Board (the "Compensation Committee") from at least 2004 to 2008, and Chairman of the Risk Oversight Committee from 2006 to 2008.

18.     Defendant Robert R. Glauber "(Glauber") has served as a director of Freddie Mac since March 15, 2006 and as a member of the Audit Committee, Finance Committee and Risk Oversight Committee since 2006.   Glauber also serves as a member of the Special Litigation Committee of the Board (the "Special Committee") purportedly tasked with, among other things, investigating the allegations made by Plaintiffs in their March 26, 2008 demand letter (the "Demand").

19.     Defendant Barbara T. Alexander ("Alexander") has served as a director of Freddie Mac since November 2004 and as a member of the Finance Committee from November 2004 to January 2008 and the Mission, Sourcing and Technology Committee of the Board (the "Technology Committee") since November 2004, chairing the Technology Committee since June 2007.

20.     Defendant Martin F. Baumann ("Baumann") served as Executive Vice President, Finance and Chief Financial Officer of Freddie Mac from April 2003 until March 22, 2006.

21.     Defendant William M. Lewis, Jr. ("Lewis") has served as a director of Freddie Mac and as a member the Finance Committee and the Technology Committee since November 2004.

22.     Defendant Jeffrey M. Peek ("Peek") served as a director of Freddie Mac from

January 2006 to September 7, 2007, and as a member of the Finance Committee and the Technology Committee from 2006 to 2007.

23.     Defendant Geoffrey T. Boisi ("Boisi") has served as a director of Freddie Mac since November 2004, as Chairman of the Compensation Committee since 2004, and as a member of the Technology Committee and the Risk Oversight Committee since 2004 and 2006, respectively.

24.     Defendant Ronald F. Poe ("Poe") served as a director of Freddie Mac from February 1990 to June 2007 and as a member of the Compensation Committee from at least 2004 to 2007, the Risk Oversight Committee from at least 2005 to 2007 and Chairman of the Technology Committee from 2005 to 2007. From April 26, 2006 to June 1, 2007, Poe, based upon his knowledge of material non-public information regarding the Company, sold 20,595 shares of Freddie Mac common stock garnering proceeds of $1,284,831.95.

25.     Defendant Mike Perlman (Perlman) has served as Executive Vice President of Operations and Technology of Freddie Mac since August 2007.

26.     Defendant Kirk D. Die ("Die") has served as General Auditor of Freddie Mac since April 2006. From May 4, 2007 to June 19, 2007, Die, based upon his knowledge of material non-public information regarding the Company, sold 3,257 shares of Freddie Mac common stock garnering proceeds of $163,594.06.

27.     Defendant James R. Egan ("Egan") has served as Corporate Controller of Freddie Mac since April 2006. From May 4, 2007 to June 5, 2007, Egan, based upon his knowledge of material non-public information regarding the Company, sold 431 shares of Freddie Mac common stock garnering proceeds of $28,737.11.

28.     Defendant Paul G. George ("George") has served as Executive Vice President,

Human Resources of Freddie Mac since August 2005. From August 22, 2006 to August 22, 2007, George, based upon his knowledge of material non-public information regarding the Company, sold 4,624 shares of Freddie Mac common stock garnering proceeds of $298,092.86.

29. Defendant Michael May ("May") has served as Senior Vice President, Mortgage Sourcing, Operations and Funding of Freddie Mac since August 11, 2005. Previously, May served as Senior Vice President and Chief Operating Officer of Single Family Operations from July 2002 to October 2003, Senior Vice President, Project Enterprise Execution from June 2000 to June 2002, Senior Vice President, Customer Services and Control from August 1998 to June 2000 and in various other positions at the Company from 1983 to 1998. From March 2, 2006 to December 31, 2007, May, based upon his knowledge of material non-public information regarding the Company, sold 20,821 shares of Freddie Mac common stock garnering proceeds of $1,270,882.80.

30. Defendant Hollis S. McLoughlin ("McLoughlin") has served as Senior Vice President and Chief of Staff of Freddie Mac since April 2004. From April 1, 2006 to June 5, 2007, McLoughlin, based upon his knowledge of material non-public information regarding the Company, sold 2,423 shares of Freddie Mac common stock garnering proceeds of $157,079.27.

31. Defendant Paul E. Mullings ("Mullings") has served as Senior Vice President for Single Family Mortgage Sourcing of Freddie Mac since June 2005. From July 26, 2006 to July 26, 2007, Mullings, based upon his knowledge of material non-public information regarding the Company, sold 5,684 shares of Freddie Mac common stock garnering proceeds of $338,690.08.

32. Defendant Anurag Saksena ("Saksena") has served as Chief Enterprise Risk Officer of Freddie Mac since August 29, 2005. On June 5, 2007, Saksena, based upon his knowledge of material non-public information regarding the Company, sold 555 shares of

Freddie Mac common stock garnering proceeds of $37,151.70.

33.     Defendant Jerry Weiss ("Weiss") has served as Senior Vice President and Chief Compliance Officer of Freddie Mac since October 2003. From April 1, 2006 to December 31, 2007, Weiss, based upon his knowledge of material non-public information regarding the Company, sold 2,691 shares of Freddie Mac common stock garnering proceeds of $148,866.56.

34.     Defendant Ralph F. Boyd, Jr. ("Boyd") has served as Executive Vice President, Community Relations of Freddie Mac since February 2005 and previously served as General Counsel and Corporate Secretary from April 2004 to February 2005. From April 1, 2006 to December 11, 2007, Boyd, based upon his knowledge of material non-public information regarding the Company, sold 3,231 shares of Freddie Mac common stock garnering proceeds of $184,098.54.

35.     Defendant Joseph A. Smialkowski ("Smialkowski") has served as Executive Vice President, Operations and Technology of Freddie Mac since December 2004. From May 6, 2006 to June 5, 2007, Smialkowski, based upon his knowledge of material non-public information regarding the Company, sold 7,741 shares of Freddie Mac common stock garnering proceeds of $515,608.59.

36.     Defendant Robert Y. Tsien ("Tsien") has served as Senior Vice President, Mission Oversight and Development of Freddie Mac since December 2004. Previously, Tsien served as Senior Vice President, Production in the Multifamily Division from October 2003 to December 2004, Chief Credit Officer from September 2001 to October 2003 and Vice President of Multifamily Risk Management from April 2000 to September 2001. From April 1, 2006 to June 5, 2007, Tsien, based upon his knowledge of material non-public information regarding the Company, sold 1,176 shares of Freddie Mac common stock garnering proceeds of $74,931.42.

37.     Defendant Robert E. Bostrom ("Bostrom") has served as Executive Vice President and General Counsel of Freddie Mac since February 1, 2006. From March 3, 2007 to June 5, 2007, Bostrom, based upon his knowledge of material non-public information regarding the Company, sold 2,127 shares of Freddie Mac common stock garnering proceeds of $137,778.13.

38.     Defendant Michelle Engler ("Engler") has served as a director of Freddie Mac since June 2001 and as a member of the Technology Committee since June 2005. Previously, Engler served as a member of the Audit Committee from at least 2004 until June 2005 and as a member of a previously formed Special Derivative Litigation Committee of the Board (the "Special Derivative Litigation Committee") from December 2003 to April 2007, serving as Chairman of the Special Derivative Litigation Committee from June 2005 to April 2007. Engler also serves as a Chairman of the Special Committee purportedly tasked with, among other things, investigating the allegations made by Plaintiffs in the Demand.

39.     Defendant Thomas S. Johnson ("Johnson") has served as a director of Freddie Mac since June 2004 and as Lead Director of Freddie Mac since June 2005. Johnson has also served as a member of the Compensation Committee and the Audit Committee since June, 2005, and the Risk Oversight Committee since 2007.   Previously, Johnson served as a member of the Special Derivative Litigation Committee from at least 2005 to April 2007.

40.     Defendant Nicholas P. Retsinas ("Retsinas") has served as a director of Freddie Mac and as a member of the Finance Committee and the Technology Committee since June 2007.   Retsinas also serves as a member of the Special Committee purportedly tasked with, among other things, investigating the allegations made by Plaintiffs in the Demand.

41.     Defendant Jerome P. Kenney ("Kenney") has served as a director of Freddie Mac

since June 6, 2008.

42.    Collectively, defendants Syron, Cook, Piszel, McQuade, Goetz, Ross, O'Malley, Glauber, Alexander, Baumann, Lewis, Peek, Boisi, Poe, Perlman, Die, Egan, George, May, McLoughlin, Mullins, Saksena, Weiss, Boyd, Smialowski, Tsien, Bostrom, Engler, Johnson, Retsinas and Kenney are referred to herein as the Individual Defendants.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

43.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.   Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

44.    The preceding description of the duties and responsibilities of a corporate fiduciary are required of the officers and directors of any company, but the Individual Defendants, self-admittedly, are required to exercise their fiduciary duties under a framework of heightened responsibilities to Freddie Mac and its shareholders.   These heightened duties are set forth in the Company's Code of Conduct as follows:

- Act at all times in accordance with this Code of Conduct and Corporate Policies and Procedures expressly applicable to Outside

Directors.

- Act at all times with integrity, and at all times deal fairly and honestly with Freddie Mac, your fellow Directors, Freddie Mac's employees and others with whom you interact in performing your Freddie Mac duties.

- Act at all times in good faith, with due care, competence and diligence, and without misrepresenting facts or circumstances.

- Comply at all time with all laws, regulations and other legal requirements that apply to your Freddie Mac duties.

- Act at all times in Freddie Mac's business interests, without allowing your independent judgment to be subordinated to other interests, and do not use your directorship with Freddie Mac for private gain (other than your Freddie Mac director fees and benefits).

- When performing your Freddie Mac duties, do not engage in conduct that creates the appearance of impropriety, even if you believe that such conduct is not improper.

45.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.   Because of their advisory, executive, managerial, and directorial positions with Freddie Mac, each of the Individual Defendants had knowledge of the material non-public information regarding the Company.

46.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

    a.    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business;

    b.    exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with the Company's by-laws and all applicable federal and state laws, rules,

regulations and requirements, including acting only within the scope of its legal authority;

c.   exercise good faith in supervising the preparation and filing of all financial statements and other financial information required by law, and in examining and evaluating the financial statements and other information concerning the financial affairs of the Company;

d.   refrain from disseminating materially false and misleading statements and/or omitting material information; and

e.   refrain from acting upon material inside corporate information to benefit themselves.

47.   Additionally, the Individual Defendants were responsible for maintaining and establishing adequate internal accounting controls for the Company and to ensure that the Company's financial statements were based on accurate financial information.  According to Generally Accepted Accounting Principles ("GAAP), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, the Individual Defendants were required to:

(1)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

(a)   transactions are executed in accordance with management's general or specific authorization;

(b)   transactions are recorded as necessary to permit preparation of financial statements in conformity with [GAAP]

48.   Moreover, Freddie Mac's Code of Conduct requires even more stringent standards for record keeping and reporting as detailed below:

**F. Record Keeping and Reports**

Freddie Mac has established policies, procedures and processes to meet

both legal and business reporting requirements. It is Freddie Mac's policy that any report, document, or other information that you or Freddie Mac files or causes to be filed with, or submits or causes to be submitted to, a government agency or discloses to the public shall be fair, timely and understandable given the circumstances under which it is used, filed, submitted or disclosed.

Section VI (D) below sets forth required reporting of purchases and sales of company equity securities. *In addition, in the event you are required in your capacity as a Director to certify company reports or records based on information provided by others, you must exercise at least that degree of care required by applicable law to be sure that those reports or records do not contain intentional misrepresentations or misleading information.*

## BACKGROUND

49. Freddie Mac is a stockholder-owned company that was chartered by Congress in 1970 pursuant to the Federal Home Loan Mortgage Corporation Act, 12 U.S.C. §§ 1451-1459 (the "Act").

50. Freddie Mac's Charter sets forth the purpose of the Company:

(1) to provide statiblity in the secondary market for residential mortgages;

(2) to respond appropriately to the private capital market;

(3) to provide ongoing assistance to the secondary market for residential mortgages (including activities related to mortgages on housing for low- and moderate-income families involving a reasonable economic return that may be less than the return earned on other activities) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing; and

(4) to promote access to mortgage credit throughout the Nation (including central cities, rural areas, and underserved areas) by increasing the liquidity of mortgage investments and improving the distribution of investment capital available for residential mortgage financing.

51. Freddie Mac's operations in the secondary mortgage market consist primarily of purchasing previously originated loans from mortgage lenders and then pooling them and securitizing them, thereby creating securities that the Company dubs mortgage Participation

Certificates ("PCs"). Freddie Mac generates income from its issuance of PCs. However, Freddie Mac typically assumes the credit risk on the mortgage loans underlying the PCs, and therefore bears all the risk of default by the borrowers in the underlying mortgages.

52. Freddie Mac also operates in the secondary mortgage market by buying whole mortgage loans and mortgage-related securities and holding them for investment purposes in its "Retained Portfolio." Similar to PCs, Freddie Mac bears significant risk of default on these instruments that it holds for investment in its "Retained Portfolio."

53. Freddie Mac's Charter also limits the Company's ability to purchase mortgages that have insufficient capitalization in order to insulate Freddie Mac against credit losses through foreclosure risk. Specifically, the Charter states:

> No conventional mortgage[2] secured by a property comprising one- to four-family dwelling units shall be purchased under this section if the outstanding principal balance of the mortgage at the time of purchase exceeds 80 per centum of the value of the property securing the mortgage, unless (A) the seller retain a participation of not less than 10 per centum in the mortgage; (B) for such period and under such circumstances as the Corporation may require, the seller agrees to repurchase or replace the mortgage upon demand of the Corporation in the event that the mortgage is in default; or (C) that portion of the unpaid principal balance of the mortgage which is in excess of such 80 per centum is guaranteed or insured by a qualified insurer as determined by the Corporation.

54. Freddie Mac is subject to supervision and regulation by the Office of Federal Housing Enterprise Oversight ("OFHEO") pursuant to the Federal Housing Enterprises Financial Safety and Soundness Act of 1992.

55. On December 9, 2003, Freddie Mac entered into a consent order with the OFHEO following a determination by the Director of the OFHEO that "Freddie Mac engaged in conduct

---

[2] The Act defines conventional mortgage as "a mortgage other than a mortgage as to which the Corporation has the benefit of any guaranty, insurance or other obligation by the United States or any of its agencies or instrumentalities."

that does not conform with the Federal Housing Enterprises Financial Safety and Soundness Act

of 1992 ("Safety and Soundness Act"), OFHEO rules, guidances and standards, and the Federal

Home Loan Mortgage Corporation Act and that such conduct has resulted in harm to [Freddie

Mac]." The consent order required, among other things, the following:

> Article II        Board of Directors and Senior Management
>
> 3.  Within 120 days from the date of this Order, the Board shall cause to be conducted a review of the Enterprise's bylaws in light of the factors contributing to the restatement and revision of the Enterprise's financial statements for 2000, 2001 and 2002. Based on this review, the Board shall cause such revisions to be made in the Enterprise's bylaws as the Board determines to be appropriate.
>
> \*        \*        \*
>
> 4.  Within 120 days from the date of this Order, the Board shall cause to be conducted a review of the Enterprise's codes of conduct for the Board and for employees in light of the factors contributing to the restatement and revision of the Enterprise's financial statements for 2000, 2001 and 2002, and shall cause such revisions to be made in those codes of conduct as the Board determines to be appropriate and such employee training programs to be developed and implemented as the Board determines to be appropriate.
>
> \*        \*        \*
>
> 5.  Within 180 days from the date of this Order, the Board shall cause to be prepared a succession plan for the Enterprise's senior management. . . . (For purposes of this paragraph, senior management means the Enterprise's chief executive officer, chief operating officer, chief financial officer and general counsel, and the heads of the Investment & Capital Markets Division and the Mortgage Sourcing, Operations & Funding Division.)
>
> 6.  Within 120 days from the date of this Order, the Board shall cause to be conducted a review of its committee structure and shall determine what changes, if any, are appropriate to make in such committee structure. This review shall take into account the need for effective Board oversight of essential Enterprise functions, including management implementation of internal controls and operational risk planning.

\*    \*    \*

7. Within 150 days from the date of this Order, the Board shall cause to be reviewed the frequency of regular Board meetings, the Board's process (including amount of time allotted) for full Board consideration of Board committee reports, and the Board's processes for obtaining information from management with respect to both the Enterprise's ongoing operations and issues of special importance to the Enterprise.

Based on this review, the Board shall determine what revisions, if any, are appropriate to make in the frequency of regular Board meetings, in the board's process (including the amount of time allotted) for full Board consideration of Board committee reports, and in the Board's processes for obtaining information from management with respect to both the Enterprise's ongoing operations and issues of special importance to the Enterprise.

\*    \*    \*

8. Within 120 days from the date of this Order, the Board shall determine what limits, if any, to establish on the terms of the Board.

\*    \*    \*

10. At least once annually, the Board shall review, with appropriate professional assistance, the legal and regulatory requirements that are applicable to its activities and duties.

11. At least once annually, the Enterprise's senior management shall review, with appropriate professional assistance, the legal and regulatory requirements applicable to their activities and duties.

\*    \*    \*

13. The Enterprise shall separate the position of Chairman and the position of Chief Executive Officer within a reasonable period of time.

14. Within 180 days from the date of this Order, Enterprise shall submit to OFHEO an acceptable plan setting forth specific actions that Enterprise will take to foster a management culture in which appropriate consideration is given to operational stability and legal and regulatory compliance throughout the Enterprise, as essential elements of a management approach that seeks properly to address all relevant risks and to maximize the Enterprise's long term value. Such actions shall include appropriate training of the Enterprise's

officers and employees, and steps to make the Enterprise's compensation system for executive officers consistent with fostering the management culture contemplated under this paragraph.

Article III      Internal Controls

*      *      *

17. At lease once annually, the Enterprise's senior management shall review the effectiveness of the internal controls that are the subject of paragraphs 15-16, and shall report to the Board, or an appropriate Board committee, on the results of the its review.  A copy of senior management's report shall be submitted to the OFHEO.

18. The Enterprise shall have established the position of chief risk officer with responsibility for the Enterprise's risk oversight function.  Within 60 days of the date of this Order, the Enterprise shall report to OFHEO on the functions of the chief risk officer and to whom such officer shall report.

19.  The Enterprise shall have established the position of chief compliance officer.  Within 60 days of the date of this Order, the Enterprise shall report to OFHEO on the functions of the chief compliance officer and to whom such officer shall report.

*      *      *

Article VI      Risk Management Transactions

22. (a)  Within 90 days after the date of this Order, the Enterprise shall develop procedures with respect to:

(i) Appropriate management oversight that a business purpose exists for unique transactions related to risk management or where a business purpose is required under generally accepted accounting principles for a transaction relating to risk management.

(ii) Maintaining appropriate records of business purpose of unique transactions relating to risk management or where a business purpose is required under generally accepted accounting principles for a transaction relating to risk management.

*      *      *

Article VII      Public Disclosures and Regulatory Reporting

23. Within 90 days from the date of this Order, the Enterprise shall submit to OFHEO an acceptable plan setting forth specific actions that the Enterprise will take to address the adequacy of its public disclosures practices and to have in place effective ongoing management oversight of its public disclosure practices.

\*       \*       \*

Article IX       Civil Monetary Penalty

29. Within ten days from the date of this Order, the Enterprise shall transfer $125 million, in the manner specficied by the General Counsel of OFHEO, in the name of the United States Treasury. This amount shall constitute a civil money penalty imposed on the Enterprise pursuant to 12 U.S.C. § 4636.

56.   As of April 10, 2007, when the OFHEO's 2007 Report to Congress was released and nearly three and a half years after the December 9, 2003 consent decree was entered into, the OFHEO was continuing to monitor "management's progress against a comprehensive plan to address key issues highlighted by the Consent Order, including *strengthening internal controls, developing a risk management oversight program, improving the internal accounting function, augmenting the internal audit program and striving to make positive changes to the corporate culture.*"

## SUBSTANTIVE ALLEGATIONS

### Freddie Mac's Internal Control Failures and Entrance into the Subprime Market

57.   Starting in 2000, Freddie Mac began to substantially increase the Company's purchases of subprime mortgages, purchasing $18.6 billion in subprime loans.

58.   Over the next few years, subprime lending increased substantially in mortgage originations as traditional mortgage loan activity declined in the face of exceedingly low interest rates.   Freddie Mac continued to purchase these subprime mortgages, which in certain circumstances violated the Company's charter as the loan to value percentage was in excess of 80% and was not insured or guaranteed, and by 2005, Freddie Mac had purchased and/or

guaranteed hundreds of billions of dollars of subprime mortgages.

59.   In Freddie Mac's 2005 Annual Report the Company admitted as much, stating:

> The dramatic increases in housing prices over the last few years have resulted in the origination of a greater proportion of alternative mortgage products, including initial interest-only loans and option adjustable-rate mortgage loans, or Option ARMs. We have historically purchased limited amounts of these alternative products through our securitization programs. However, recently we have increased our purchases of these products consistent with the increase in their prevalence in the market. We are continuing to explore ways in which we can become more involved with these products and we expect our participation in these products to grow over the coming years.
>
> *     *     *
>
> During 2005 and 2004, there was a rapid proliferation of alternative product types designed to address a variety of borrower needs, including issues of affordability and lack of income documentation. While each of these products has been on the market for some time, their prevalence increased in 2005 and 2004. We expect each of these products to default more often than traditional products and we consider this when determining our guarantee fee. Our purchases of interest-only and Option ARM mortgage products increased in 2005, representing approximately 11 percent of our Total mortgage portfolio purchases as compared to 2 percent in 2004, and we expect this trend to continue in 2006. Despite this recent increase in purchases, these products represent a small percentage of the unpaid principal balance of our Total mortgage portfolio. At December 31, 2005 and 2004, interest-only and option ARMs collectively represented approximately 3 percent and less than 1 percent, respectively, of the unpaid principal balance of the Total mortgage portfolio. We will continue to monitor the growth of these products in our portfolio and, if appropriate, may seek credit enhancements to further manage the incremental risk.

60.   Freddie Mac's 2005 Annual Report also discussed the Company's increased

purchase of mortgages through automated underwriting systems including the Company's own

"Loan Prospector":

> We have been expanding the share of mortgages we purchase that were underwritten and originated using alternative automated

> underwriting systems, which could increase our credit risk. We
> regularly monitor the performance of mortgages purchased using
> these systems and if they underperform mortgages originated using
> Loan Prospector we may seek additional compensation for
> guaranteeing such mortgages in the future.

61.     However, the Company's 2005 Annual Report failed to discuss the debilitating

and systemic deficiencies in Freddie Mac's internal controls and procedures that prevented the

Company from adequately monitoring the Company's increasing acquisition of high risk

subprime mortgages through its own automated Loan Prospector system, let alone the subprime

mortgages Freddie Mac purchase that were originated by suspect mortgage lenders through

alternative automated underwriting systems.

62.     Despite the Company's acknowledgement of the risk of these mortgages, in an

effort to keep up with the market, the Company purchased more and more subprime mortgages

with increasingly lax credit and underwriting standards supplied by the loan originators while the

Individual Defendants knew that the Company's risk management and other internal controls and

procedures were insufficient to guard against the potential risk of default on these extremely high

risk mortgages.

63.     As an example of the Company's inadequate internal controls and procedures, on

August 31, 2005, Freddie Mac announced the Company's financial results for the first half of

2005, after failing to report the Company's first quarter results for 2005, stating, in relevant part:

> Freddie Mac (NYSE:FRE) today reported financial results for the
> first six months of 2005.
>
> The company reported GAAP net income of $1,644 million for the
> first six months of 2005, down from $4,066 million for the first six
> months of 2004. Fair value of net assets attributable to common
> stockholders, before capital transactions, increased by $1.1 billion
> for the first six months of 2005, compared to growth of $2.5 billion
> for the first six months of 2004. Freddie Mac's regulatory core
> capital is estimated to have grown to $36.1 billion at June 30,
> 2005, with a regulatory minimum capital surplus estimated at

$12.1 billion at June 30, 2005, and an estimated $4.8 billion in excess of the 30-percent target surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO).

"We are making excellent progress on improving the business in ways that will both advance our housing mission and reward our stockholders," said Richard F. Syron, Freddie Mac chairman and chief executive officer. "In the first six months of 2005, we launched a number of new initiatives and products and made progress towards meeting our affordable housing goals. We increased our market share, further strengthened our capital position and our management team and have taken actions to keep our administrative expenses relatively flat for 2005. With today's release of financials for the first half of 2005, we have taken another big step in our push to being fully current in our financial reporting by early 2006."

"Good things are happening in our business and we're happy with our first half momentum," said Eugene M. McQuade, Freddie Mac president and chief operating officer. "*For example, we grew our GSE market share while keeping our interest rate risk and credit risk at very low levels.* Because our GAAP financial results reflect a mix of historical cost and fair value marks, they don't give as complete a picture as we get from looking at all of our metrics – GAAP, fair value, business and risk management results. Taken as a whole, we've made solid progress."

64.     The preceding press release contained false and misleading statements regarding the Company's purportedly low credit risk, because the Individual Defendants knew that the Company's credit risk was steadily increasing as a result of its purchase of subprime mortgages.

65.     The very next day, on September 1, 2005, the Company entered into an agreement with the OFHEO to update and continue the implementation of certain voluntary commitments that were originally announced on October 19, 2000 and related, in part, to financial risk management and disclosure. Specifically, the agreement required Freddie Mac to comply with, among other things, the following provisions:

2. Liquidity Management and Contingency Planning

[Freddie Mac] will comply with principle of sound liquidity management consistent with industry practice. In addition,

[Freddie Mac] will:

- Maintain a portfolio of highly liquid assets. The size of this liquid asset portfolio will be established by [Freddie Mac] and assessed by the OFHEO Examiner in Charge.

- Maintain a functional contingency plan providing for at least three months' liquidity (using internal forecasts) without relying upon issuance of unsecured debt.

- Periodically test the contingency plan in consultation with its OFHEO Examiner-in-Charge.

3. Public Disclosures

[Freddie Mac] will provide periodic public disclosures on its risks and risk management practices and will inform its OFHEO Examiner-in-Charge of the disclosures.   (Footnote admitted). These disclosures for [Freddie Mac] will include:

Subordinated Debt Disclosure

- Compliance of the corporation with the commitment regarding subordinated debt, including a comparison of the quantity of subordinated and total capital levels set forth above.

Liquidity Management Disclosure

- Compliance of the corporation with the plan for maintaining three months' liquidity and meeting the commitment for periodic testing.

Interest Rate Risk Disclosures

- Monthly averages of its duration gap.  [Freddie Mac] will work with OFHEO to try to align its measures as much as practicable.

- Monthly disclosures of the impact on its financial condition of both a 50-basis point shift in rates and a 25-basis point change in the slope of the yield curve.

Credit Risk Disclosures

- Quarterly assessments of the impact on the corporation's expected credit losses from an immediate 5 percent decline in single-family home prices for the

entire U.S.

- Impact will be reported in present value terms and measure losses to the corporation both before and after receipt of private mortgage insurance claims and other credit enhancements.

Public Disclosure of Risk Rating

- [Freddie Mac] will seek to obtain a rating that will be continuously monitored by at least one nationally recognized statistical rating organization.

- The rating will assess, among other things, the independent financial strength of "risk to the government" of the corporation operating under its authorizing legislation but without assuming a cash infusion or extraordinary support of the government in the event of a financial crisis.

66.     Only a couple of months later, on November 8, 2005, Freddie Mac announced that it would have to revise its previously announced earnings substantially downward as a result of continuing internal control problems.   Specifically, the Company and defendant Baumann stated, in relevant part:

> Freddie Mac (NYSE:FRE) announced today that it will reduce net income for the first half of 2005 by approximately $220 million, resulting in reported net income for the first half of 2005 of $1.4 billion, compared with $1.6 billion previously reported in the company's August 31, 2005 press release.
>
> The revision reflects the correction of interest accruals recorded for certain mortgage-related securities stemming from miscalculations since 2001 in a legacy computer system. ***Management found and corrected the miscalculations in the course of its ongoing internal control enhancements***.   The correction represents less than one percent of the company's $36.1 billion of reported regulatory core capital as of June 30, 2005.
>
> "We've made enormous strides in fixing our financial infrastructure but, as we have previously disclosed, the effort is not yet complete," said Martin F. Baumann, Freddie Mac's chief financial officer.   "When we found this error, we corrected it immediately.   We are continuing to move forward to complete the

job of producing timely, accurate financial reports early in 2006. We've also made great progress this year in our business – increasing our market share, building on our already strong capital position and maintaining excellence in risk management."

Management has devoted substantial financial and personnel resources to improving Freddie Mac's internal controls and continues to remediate material weaknesses in controls over financial reporting.   To provide greater assurance over the reliability of the company's financial reports, management has decided to accelerate a number of previously planned control initiatives into the fourth quarter of 2005.

Freddie Mac expects that its timetable for beginning the registration process with the Securities and Exchange Commission (SEC) will not be significantly changed. The company also expects to release fourth quarter and full-year 2005 results and to begin filing timely, GAAP-compliant monthly capital reports with its regulator, the Office of Federal Housing Enterprise Oversight, no later than the end of March 2006. The company also expects to hold an investor conference call to discuss third quarter performance within the next 30 days. The company expects to release full third quarter financial results upon completing further control work.

<div align="center">*       *       *</div>

**Detail of Accrual Revision**

The miscalculation of interest income stemmed from an error in a legacy computer system used to compute interest on certain mortgage-related securities (primarily non-agency securities) that accrue interest on other than a calendar-month basis. The system over-accrued interest income beginning in the month of purchase, with over-accruals generally decreasing as the security paid down, and reversing in the month the security was sold or matured.

Freddie Mac expects to reduce previously reported net income for the first quarter of 2005 by $136 million to reflect the cumulative overstatement occurring in prior years and by a further $33 million to reflect the overstatement occurring in the first quarter of 2005. Freddie Mac also expects to reduce previously reported net income for the second quarter of 2005 by $51 million to reflect the overstatement occurring in that period.

67.    The preceding earnings press release was false and misleading, because Freddie

Mac failed to meet its self imposed timeline of "no later than the end of March 2006" for the release of the Company's fourth quarter and full-year 2005 results. Instead the Company did not announce the preceding financial results until May 30, 2006 in a press release entitled "Freddie Mac Reports 2005 Financial Results," wherein the Company stated, in relevant part:

> McLean, VA – Freddie Mac (NYSE:FRE) today reported GAAP net income of $2.1 billion for 2005.
>
> The decline in net income from $2.9 billion for 2004 was due primarily to approximately $600 million of costs associated with the recent agreement to settle the securities class action and shareholder derivative litigation, charges related to Hurricane Katrina and the net impact of certain accounting changes. Freddie Mac's regulatory core capital is estimated to have grown to $36.0 billion at December 31, 2005, with an estimated $3.5 billion in excess of the 30-percent target surplus. *The company's interest-rate and credit risks remain near historic lows.*
>
> "Freddie Mac made continued progress throughout 2005, delivering long-term value to the nation's homeowners and to our stockholders as we've strived to fulfill our mission and solidify business execution," said Chairman and CEO Richard F. Syron. "We provided more support for low- and moderate-income homebuyers, increased our market share, streamlined our business operations and added key talent to our senior management team. With the release today of our 2005 results, we are positioned to initiate the capital management activities we announced last year."
>
> In 2005, Freddie Mac financed homes for more than four million families. In addition, while the final determination will be made by the Secretary of HUD, we reported that we met all of our regulatory affordable housing goals for 2005. We estimate our share of government-sponsored enterprise mortgage securitizations was 45 percent in 2005, compared to 41 percent in 2004, as we improved service quality and products and forged new and stronger relationships with mortgage lenders and other key business partners.
>
> "2005 was a year of continued investment in the business capabilities, infrastructure and management team here at Freddie Mac," said Eugene M. McQuade, president and chief operating officer. "These investments position our company to achieve our long-term growth and return objectives, and to deliver long-term value to the market and our stockholders. As we execute on our

2006 priorities, we have a strong capital position, growing business momentum and a determination to resolve remaining financial infrastructure challenges. Dick and I feel very good about the long-term prospects of this franchise."

**2005 RESULTS**

***GAAP Financial Results***

Net income was $2.1 billion for 2005, down from $2.9 billion for 2004. Diluted earnings per common share were $2.75 for 2005, down from $3.94 for 2004. GAAP return on common equity was 7.72 percent for 2005, down from 10.16 percent for 2004. Consistent with management's previous guidance, year-over-year total revenue was lower in 2005 as a result of lower net interest income from narrowing spreads on fixed-rate assets and a greater proportion of floating-rate assets purchased in 2005.

2005 net income also was adversely affected by approximately $600 million as a result of the following:

The agreement to settle securities class action and shareholder derivative litigation of approximately $220 million,

Charges related to Hurricane Katrina of approximately $133 million, and

The cumulative impact of a change in accounting principle and significant changes in estimate adopted in 2005 totaling approximately $265 million.

Net income was $226 million, $340 million, $880 million and $684 million for the first, second, third and fourth quarters of 2005, respectively, compared to $1,312 million, $2,754 million, ($1,506) million and $377 million for the comparable quarters of 2004. Our quarterly results reflect the impact of accounting corrections and changes (e.g., the new valuation methodology for guarantee assets and obligations) and subsequent events (e.g., the recent litigation settlement) occurring after our initial release of first and second quarter information in August 2005. Going forward, as interest rates change, our period-to-period results are likely to continue to exhibit earnings volatility primarily as a result of the asymmetric mark-to-market accounting treatment of certain assets and liabilities on our balance sheet that is reflected in our income statement.

Regulatory core capital was $36.0 billion at December 31, 2005, with a regulatory minimum capital surplus estimated at $11.0

billion, and an estimated $3.5 billion in excess of the 30-percent target surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO), as reported in our amended capital report filed with OFHEO in conjunction with the issuance of this earnings release.

<div align="center">*     *     *</div>

## 2005 AND YEAR-TO-DATE 2006 BUSINESS RESULTS

### *Portfolio Growth*

We continue to deliver on our charter responsibility to be a provider of secondary mortgage market liquidity through both investment and securitization activities.   The unpaid principal balance (UPB) of our retained portfolio grew 8.7 percent in 2005, to $710 billion, and grew to $724 billion as of April 30, 2006, an annualized growth rate of approximately 5.8 percent.  The UPB of our portfolio of PCs and structured mortgage securities issued grew 10.5 percent in 2005, to approximately $1,336 billion, and grew to $1,390 billion as of April 30, 2006, an annualized growth rate of approximately 12.1 percent.  The growth in 2005 was due in part to the company's successful efforts to increase market share. We estimate our share of government-sponsored enterprise mortgage securitizations was 45 percent in 2005, compared to 41 percent in 2004 and 46 percent year-to-date through March.  As a result of these activities, during 2005 and continuing through the first quarter of 2006, we believe that we have increased our penetration of the total conventional conforming mortgage market. This increase was largely a result of our improvement in GSE market share and retained portfolio purchases of non-agency mortgage-related securities.

### *Interest-Rate Risk Management*

The company's interest-rate risk remains low. For 2005 and the first four months of 2006, Portfolio Market Value Sensitivity (PMVS) and duration gap have averaged one percent and zero months, respectively.

### *Credit-Risk Management*

The company's credit risk also remains low. As of March 31, 2006, the total single-family delinquency rate was 59 basis points, compared to 69 basis points as of December 31, 2005 and 73 basis points as of December 31, 2004.

### *Expenses*

Non-interest expense was $3.0 billion in 2005, up from $2.4 billion in 2004, primarily due to the agreement to settle the securities class action and shareholder derivative litigation and charges related to Hurricane Katrina. We met our objective in 2005 of keeping administrative expenses, which are the most controllable component of non-interest expense, flat compared to 2004, at approximately $1.5 billion. Going forward, our intent is to manage administrative expenses as a declining percentage of our total mortgage portfolio while at the same time providing the resources needed to support our internal control and financial reporting infrastructure initiatives.

## FINANCIAL REPORTING UPDATE

During 2006, the company will provide quarterly market updates that will include estimates of net income derived from capital reports submitted to OFHEO, information and analysis on key drivers of current financial and business performance, and updates to the market on our business outlook and progress on financial infrastructure and control remediation initiatives. Our objective is to return to quarterly reporting, and file timely, GAAP-compliant capital reports with OFHEO, with our release of full-year 2006 results. After we resume regular quarterly reporting, we will begin the process of registering the company's common stock with the Securities and Exchange Commission.

## INTERNAL CONTROLS UPDATE

Improving internal control over financial reporting and addressing the risks of material weaknesses and other control deficiencies have been priorities for us and will continue to be so in 2006. The company is pursuing a series of initiatives to improve our financial reporting infrastructure and remediate material weaknesses and other deficiencies in our internal control environment. Most significantly, these initiatives include an end-to-end assessment of the design and effectiveness of the company's internal control over financial reporting, and an initiative to improve information technology-related controls, together with remedial actions needed to address any issues identified in the course of these reviews. Additionally, we are scheduled to implement several planned system enhancements later in the year. A more complete discussion of the status of our remediation efforts is included in the Information Statement Supplement dated as of today and available on our Web site.

***Despite our ongoing challenges in these areas, we believe our interest-rate and credit risks remain well managed, as***

*demonstrated by our reported risk metrics and results.*

68.   The Information Statement Supplement, referenced above, contained the following representations regarding the Company's internal controls and risk management:

**Internal Controls and Risk Management**

*Internal Control Over Financial Reporting*

Improving internal control over financial reporting and mitigating the risks presented by material weaknesses and other control deficiencies in our financial reporting processes continue to be top priorities in 2006. *Many of the previously identified material weaknesses and other control deficiencies continue to persist and will continue to present challenges for us in 2006. We also identified additional control deficiencies in 2005.*

The material weaknesses and significant deficiencies in our internal control over financial reporting adversely affect our ability to record, process, summarize and report financial data timely. Based on the continued existence of material weaknesses in internal control at December 31, 2005, our Chief Executive Officer and President and Chief Operating Officer have concluded that our internal control over financial reporting was not effective at December 31, 2005. In order to compensate for the material weaknesses and other deficiencies in our internal controls, we continue to perform extensive verification and validation procedures to provide assurance that our consolidated financial statements are prepared in accordance with GAAP. Therefore, in view of the alternative procedures we performed, we believe that these weaknesses and deficiencies do not prevent us from preparing and issuing our consolidated financial statements in accordance with GAAP.

While we believe we have made progress in the remediation of certain material weaknesses and other control deficiencies that have been identified, the material weaknesses and deficiencies that remain will continue to represent a significant risk to our financial reporting process until fully remediated. For example, in the course of our financial reporting processes for 2005, we discovered a number of internal control issues that resulted in adjustments to our 2005 financial results. Moreover, our employee attrition rates have been high recently, which strains existing resources and increases the risk of errors and internal fraud.

A number of the material weaknesses that affected us throughout

2005 and at the end of the year include:

- Monitoring controls within financial operations and reporting functions — Monitoring controls are designed to evaluate how other controls are working, such as the performance of financial analytics and the completion of account reconciliations. Despite the progress made in the identification, documentation, and enhancement of monitoring controls during 2005, there were several instances where these controls did not identify issues that ultimately led to accounting adjustments.

- Integration between our operational transaction systems and financial accounting systems — Integration issues among the systems and processes related to our operational transaction systems and financial accounting systems increase the risk of error in our financial reporting due to the potential failure to correctly pass information between systems and processes, incompatible data between systems, or a lack of clarity in process ownership. To compensate for this weakness, we have implemented compensating controls, including the performance of significant data validation and financial analytics, which contribute to our delayed financial reporting timeline.

- Information technology general controls as they relate to change management — Our controls over managing changes related to the development and implementation of new and enhanced business processes and systems need improvement in order to achieve industry standards.

- Information technology general controls as they relate to security administration, management and technology — Our controls over information systems security management and administration functions, as well as information technology currently in use, need improvement in a number of critical areas.

- Management risk and control self-assessment process — Our process to identify deficiencies in key financial reporting controls, prior to testing, does not provide reliable information on our risk and control environment.

In addition to material weaknesses, there are also various significant deficiencies in our internal control over financial reporting that, although not determined to be material at this time, still present risks of error in our financial reporting. As we

complete our work toward our 2005 Annual Report and continue the remediation activities noted below throughout 2006, we may identify additional material weaknesses and significant deficiencies in our internal controls or conclude that significant deficiencies we have already identified should be regarded as material weaknesses, either individually or in the aggregate.

### Risk Management

*While we believe that both our day-to-day and long-term management of interest-rate and other market risks and credit risks are satisfactory, weaknesses in our overall risk governance framework exist.* We are focused on strengthening our capacity in four important areas: risk governance, risk identification, risk measurement and assessment, and related education and communication. *Our risk management framework is being reviewed under a new leadership team in our Enterprise Risk Oversight division to address these issues and to establish clear lines of authority, define roles and responsibilities, and to improve the overall effectiveness of the risk oversight function.*

### Remediation

During 2005, we implemented an internal control testing and evaluation program designed to evaluate the significant components of our internal control over financial reporting and to identify whether deficiencies exist within our internal control environment. Upon discovering the need for several adjustments to our 2005 financial results in the course of completing our financial reporting processes for 2005, we began a more comprehensive review of our internal control environment. This comprehensive review includes an end-to-end assessment of the design and effectiveness of our internal control environment, an initiative to improve information technology-related controls, and taking remedial actions needed to address any issues identified in the course of these reviews.

Our end-to-end review begins with the assessment of the design and effectiveness of our internal controls environment related to the initial recording of transactions, continues this assessment through our operational and accounting processes, and concludes with an evaluation of financial reporting and disclosure controls. This comprehensive review is expected to continue throughout 2006. In addition, we are in the process of implementing several planned system enhancements to our accounting, financial reporting and operational infrastructure later in the year. As this review progresses, we may discover additional material

weaknesses or other control deficiencies or conclude that existing deficiencies are more significant or material than originally assessed. Upon discovery, if necessary, we anticipate developing a plan to remediate or mitigate any additional weaknesses and deficiencies.

In order to devote the resources needed to complete the end-to-end review effectively and return to timely reporting as soon as possible, we have decided to delay our interim financial reporting for 2006. We have also decided to limit the number of initiatives we plan to undertake in 2006 and defer lower priority systems efforts until we have progressed further with our internal controls. It is our objective to return to quarterly reporting with our release of full-year 2006 financial results. After we resume regular quarterly reporting, we will begin the process of registering our common stock with the Securities and Exchange Commission.

Our comprehensive review of the internal control environment, which began in 2005, and our ongoing control remediation activities are intended to provide a basis for our reliance on our internal control over financial reporting. Our ability to rely on such internal controls is essential to our return to timely reporting, because it will alleviate the need to perform substantive procedures to compensate for our material weaknesses and other control deficiencies.

69.     Despite heralding the growth of the Company's "Retained Portfolio," in the May 30, 2006 press release, just two months later on July 31, 2006, defendant Syron sent a letter to the Director of the OFHEO agreeing to impose limitations on the Company's growth of its "Retained Portfolio" until Freddie Mac "returned to producing and publicly releasing quarterly financial statements prepared in conformity with GAAP."

70.     Freddie Mac failed to report its financial results again until March 23, 2007 in a press release entitled "FREDDIE MAC REPORTS 2006 FINANCIAL RESULTS," wherein the Company, and specifically defendants Syron and Piszel, stated, in relevant part:

McLean, VA – Freddie Mac (NYSE:FRE) today reported net income of $2.2 billion for 2006, up 4 percent compared to $2.1 billion in 2005. The company also reported an increase in the fair value of net assets attributable to common stockholders, before capital transactions, of approximately $2.5 billion for 2006,

compared to an increase of $1.0 billion in 2005.  Freddie Mac's regulatory core capital is estimated at $36.2 billion at December 31, 2006, with an estimated $2.6 billion in excess of the 30-percent mandatory target capital surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO).

During 2006, the company increased its common dividend payout by 22 percent to $1.3 billion or $2.00 per share on an annualized basis and returned $2.0 billion of capital to common stockholders in a preferred-for-common restructuring. All told, the company returned some $3.3 billion to common stockholders last year, the most in Freddie Mac history.

Also, the company announced today that it plans to repurchase up to an additional $1 billion in common stock in conjunction with the issuance of up to $1 billion in preferred stock from time to time depending on market conditions.

["]Freddie Mac grew its business, strengthened its franchise and improved long-term value for its shareholders, despite a challenging year for housing and mortgage finance," said Richard F. Syron, chairman and chief executive officer. "*In 2006, both net income and fair value return before capital transactions exceeded $2 billion, as we grew our guarantee business. We also maintained our low credit and interest-rate risk profiles, leaving us well-positioned to deal with a broad range of interest rate conditions, and with the value of our shareholders' equity well protected.*"

<div align="center">*   *   *</div>

"Our plan to repurchase an additional $1 billion in common stock and our significant return of capital to common stockholders in 2006 demonstrate Freddie Mac's progress in improving our capital structure," said Buddy Piszel, chief financial officer. "We've also made progress in our remediation efforts, as demonstrated by today's release of our 2006 annual report. We continue to make good strides towards returning to quarterly reporting later this year."

<div align="center">*   *   *</div>

The $0.09 increase in diluted earnings per common share for 2006 reflects the net effects of the increase in net income and the reduction in the diluted weighted average number of common shares outstanding, arising from the repurchase of approximately 32.7 million common shares during 2006, partially offset by an

<div align="center">35</div>

increase in preferred dividends associated with the company's issuance of $1.5 billion in new preferred stock. Pre-tax income declined by $0.5 billion to $2.1 billion in 2006 from $2.6 billion in 2005.

*         *         *

Net interest income declined by $1.2 billion. During 2006, the unpaid principal balance (UPB) of the company's retained portfolio declined slightly to approximately $704 billion, as relatively tight mortgage-to-debt option-adjusted spreads (OAS) generally limited attractive investment opportunities and the company began managing the portfolio under a voluntary growth limit announced in August 2006.

*         *         *

Management and guarantee income on PCs held by third parties increased to $1.7 billion in 2006 from $1.5 billion in 2005, as the contractual guarantee fee rate in basis points declined modestly and the average balance of outstanding PCs held by third parties increased by roughly 15 percent to $1,045 billion from $909 billion.

During 2006, the company's total credit guarantee portfolio increased by 10.6 percent to approximately $1.5 trillion. The company estimates that its share of government-sponsored enterprise (GSE) mortgage securitizations for 2006 was approximately 43 percent, compared to about 45 percent in 2005 and about 41 percent in 2004. All-in, Freddie Mac's 2006 activities provided mortgage funds for approximately 3.3 million families.

*         *         *

*In 2006, Freddie Mac experienced a slight credit deterioration in its portfolio of loans not impacted by the hurricane as more loans transitioned through delinquency to foreclosure and the expected severity of losses on a per-property basis increased.* As a result, the company recorded in 2006 a $297 million provision for credit losses as well as real estate owned expense of $60 million.

*         *         *

**Capital Management**

Estimated regulatory core capital was $36.2 billion at December 31, 2006, with an estimated regulatory minimum capital surplus of $10.3 billion, and an estimated $2.6 billion in excess of the 30-

percent mandatory target capital surplus set by OFHEO.  During 2006, the company completed the repurchase of approximately $2.0 billion of outstanding shares of common stock (approximately 32.7 million shares) at an average price of $61.06 per share and issued non-cumulative, perpetual preferred stock in the amount of $1.5 billion.

During the first quarter of 2007, the company issued $1.1 billion of non-cumulative, perpetual preferred stock and redeemed $0.6 billion of higher-cost non-cumulative, perpetual preferred stock. These transactions effectively reduced the company's cost of capital. The company announced today its plan to repurchase up to $1 billion of common stock in conjunction with the issuance of preferred stock from time to time depending on market conditions.

<div align="center">*     *     *</div>

During 2006, the company recognized a more significant mark-to-market decline in its existing book of business due to the effect of a deteriorating market view of credit and increased market risk premiums related to the company's guarantee obligation. In addition, the company estimates that the fair value of new business booked in 2006 was lower than the fair value of new business booked in 2005.

**Fourth Quarter 2006 Results**

As a result of the interest-rate movements in the last quarter, Freddie Mac reported a net loss of $480 million in the fourth quarter of 2006, as realized losses and mark-to-market impacts on the company's credit guarantee portfolio, derivatives and administrative expenses more than offset net interest income and management and guarantee income.

Freddie Mac also reported a decrease in the fair value of net assets attributable to common stockholders, before capital transactions, in the fourth quarter of 2006 of approximately $0.2 billion as the impact of OAS widening, the effect of credit deterioration on the guarantee obligation and administrative expenses more than offset the positive contributions from the company's investment and guarantee activities.

**Interest-Rate Risk Management**

Managing the company's interest-rate risk is essential to maintaining a strong and durable capital base and continuous access to debt and equity markets. Consistent with its longstanding record, the company's interest-rate risk remained low.  During

2006, the company reported that portfolio market value sensitivity (PMVS) and duration gap averaged one percent and zero months, respectively, unchanged from the prior year.

**Credit Risk Management**

The company's mortgage credit risk, as measured by the current loan-to-value ratio (LTV) of its credit guarantee portfolio and other credit characteristics, remained low. The company estimates that the credit guarantee portfolio had a LTV of 57 percent as of December 31, 2006, compared with 56 percent for 2005, and the portfolio remains geographically well diversified. Long-term, fixed-rate mortgages constituted 82 percent of the credit guarantee portfolio, despite an increase in the purchase of variable-rate products, including non-traditional mortgage products, during 2006.

At December 31, 2006, the company's $704 billion retained portfolio included $238 billion of non-agency mortgage-related securities, 96 percent of which were rated AAA or equivalent. *Included in this amount were $124 billion of non-agency mortgage-related securities backed by subprime loans, of which more than 99.9 percent were AAA rated.*

**Internal Controls**

The company is continuing to make progress on the series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to quarterly financial reporting. The comprehensive plan includes mitigation and remediation of identified material weaknesses and significant deficiencies; strengthening of the financial close process; implementing critical systems initiatives; and completion of a review of the company's system of internal controls related to the processing and recording of the company's financial transactions.

### The 2007 OFHEO Report

71. On April 10, 2007, the OFHEO released its 2007 Report to Congress examining GSEs Freddie Mac and Fannie Mae, which concluded that Freddie Mac "remain[s] a significant supervisory concern." In the letter accompanying the report, OFHEO Director James B. Lockhart stated:

The 2006 annual examinations of both Fannie Mae and Freddie Mac, contained in this report, detail the current condition of both Enterprises. OFHEO concludes that both companies remain a significant supervisory concern. OFHEO also concludes that in 2006 both companies made progress in correcting their problems, especially in systems, controls and financial reporting. Nonetheless, it has taken much more time and money to correct them than either the Enterprises or OFHEO expected. Both companies are complying with a 30 percent additional capital requirement due to operational risk problems, and both are subject to specific limits on the growth of their portfolios. Despite these constraints necessitated by their operational weaknesses, their support of the mortgage market grew by 8 percent in 2006 to $4.3 trillion as their guaranteed mortgage-backed securities (MBS) outstanding grew at double-digit rates.

A key indicator to OFHEO of a successful remediation will be the timely filing of annual and quarterly financial statements by each company with the Securities and Exchange Commission (SEC) with a clean audit opinion based upon a controls-based audit. I am pleased to report that both companies are working hard to achieve this goal, but they still have much to do.

72.     The 2007 OFHEO Report offered the following conclusions with respect to Freddie Mac's operations in light of continuing internal control deficiencies:

The Enterprise remains a significant supervisory concern. While efforts toward improvement are underway, senior management continues to revise plans and re-engineer processes to strengthen internal controls and remediate six material weaknesses and a number of significant deficiencies. Leadership from the Board and senior management is challenged as they strive to reshape the corporate culture, publish accurate and timely financial statements, implement long-term sustainable processes, improve overall governance and risk management capabilities, enhance information technology controls and stabilize the organizational structure.

Intensive efforts by the Board and management have been made to address internal control weaknesses; however, several key initiatives to remediate the control environment have not progressed as planned. Progress throughout 2006 was adversely impacted by the volume and complexity of issues, less than effective project management capabilities, and inconsistent execution in key segments of the comprehensive plan. Long-term resolution of identified issues will continue to require substantial efforts on the part of Enterprise personnel. The Board and

management must continue to focus on needed cultural and organizational improvements identified in the internally-prepared, root-cause analysis to ensure historically weak operating practices are strengthened. Improvements to systems capabilities, information processing controls and the successful implementation of re-engineered business processes will be necessary to restore the overall control environment to a satisfactory condition.

73.    Moreover, the 2007 OFHEO Report identified several areas requiring immediate Board attention:

> **Key matters** highlighted in this report **requiring strong Board oversight are**:
>
> - *Internal Controls*. The Board should continue to oversee management's progress toward remediating widespread internal control weaknesses to enable the release of accurate and timely financial statements, permit a return to controls-based auditing and build sustainable internal control governance processes.
>
> - *Information Technology*. The Board should ensure that technology-related issues identified in this report are addressed. Key challenges include gaining a deeper understanding of the key application controls, improving general controls, implementing a systems development process, improving contingency planning and developing a sustainable data and architecture strategy.
>
> - *Credit Risk Management*. Continued dose monitoring of credit portfolio trends is necessary as higher volumes of non-traditional credit products were purchased during 2006. Although these credit products are within current limits, these products exhibit higher than historical credit risk
>
> - *Corporate-wide Change Management*. The Board should continue to monitor management's efforts to: improve capabilities to effectively manage enterprise-wide change programs, gain a more in-depth understanding of the complexity of and resolution strategies for control weaknesses and support an environment that values strong internal controls and risk management functions.
>
> - *Risk Oversight Functions*. The Enterprise Risk Management functions and the Internal Audit department

> made significant strides to strengthen their respective units and define appropriate governance structures. Continued Board support during the ongoing evolution of these functions and the implementation of the risk control self-assessment process will be necessary.

74.     In the 2007 Report, the OFHEO also opined on Freddie Mac's operations and

efforts in remediating material weaknesses identified in the Company's internal controls:

> ***Operational risk is high and continues to be a primary supervisory concern. Throughout 2006, Freddie Mac was not able to produce accurate and timely quarterly financial statements. All internal control-related material weaknesses and significant deficiencies identified during 2005 or prior years' annual audits remain outstanding. The internal control structure remains fragmented, incomplete, and in some cases, undocumented.*** In addition, current systems limitations did not permit an effective and reliable quarterly close process. Remediation of control weaknesses including independent testing is required (controls must be complete and documented) before management and OFHEO can opine on the effectiveness of the control structure.
>
> The Comprehensive Plan (the primary project to return the company to timely financial reporting, improve the control environment and permit reliance on internal controls over financial reporting by the external auditor) suffered during 2006 from ineffective planning and inconsistent execution. The original plan was submitted in April 2006 and continues to be revised. Aggressive time schedules, lack of independent quality assurance, inadequate management reporting, cultural issues of responsibility and accountability and project management deficiencies contributed to insufficient progress toward achieving the Plan's overall objectives. Although management and staff have worked hard to mitigate and remediate known control weaknesses, as of December 31, 2006, no remediation activity has been tested and verified to be effective.
>
> The Comprehensive Plan includes: remediating known control weaknesses, the end-to-end business process review, close process improvements and information technology general control remediation. Since control weaknesses are widespread and pervasive across the Enterprise, identifying control gaps and remediating most of the known material weaknesses are linked to successful completion of the end-to-end business process review. At the same time, process improvements are needed to achieve a

> timely, sustainable financial close process compliant with regulatory requirements. In addition, Information Technology General Controls (ITGC) must be operating effectively before management can rely on automated information without time-consuming substantive review procedures and manual processes. The Comprehensive Plan requires continued Board and executive management involvement to ensure activities are properly sequenced, achieve plan objectives and resolve competition for resources, especially subject matter experts.
>
> * * *
>
> Although considerable efforts are under way to remedy weaknesses in internal controls related to financial reporting, additional control weaknesses may exist elsewhere in the Enterprise. Plans to identify, assess and strengthen non-financial controls are commencing. These controls may include, but are not limited to, business continuity planning business and risk performance measures and operating effectiveness metrics.

75. The OFHEO also criticized Freddie Mac's failure to adequately remediate material weaknesses and deficiencies in the Company's information technology infrastructure stating "[w]eaknesses continue in information technology systems development and delivery, information security, end-user computing systems, data quality, and change management."

76. Additionally, with respect to Freddie Mac's significant accounting policies, the OFHEO noted that "significant work remains to develop complete accounting policies and procedures."

77. Further, the OFHEO report provided a detailed analysis of Freddie Mac's asset quality and credit risk management, noting the Company's aggressive movement in the subprime market:

> Management has expanded the Enterprise's purchase and guarantee of higher-risk mortgages. In order to increase market share, meet mission goals, stay competitive and be responsive to sellers' needs, the Enterprise has increased the use of credit policy waivers and exceptions. Untested and alternative market products accounted for approximately 24 percent of 2006 new purchases and currently comprise 11 percent of the total single-family

mortgage portfolio. Internal measures of credit quality reflect that the quality of incremental new purchases declined in 2006 as evidenced by a rise in expected default costs.

### The Truth Begins to Emerge

78.    On June 14, 2007, Freddie Mac announced financial results for the first quarter of 2007 disclosing substantial losses and deteriorating credit quality of the Company's assets. In a press release entitled "Freddie Mac Releases First Quarter 2007 Financial Results; Company Resumes Quarterly Reporting," the Company, and specifically defendants Syron and Piszel, stated, in relevant part:

> McLean, VA – *Freddie Mac (NYSE:FRE) today reported a net loss of $211 million, or $0.46 per diluted common share, in the first quarter of 2007, compared to net income of $2.0 billion, or $2.80 per diluted common share, for the same period in 2006. The company also reported a decline in fair value of net assets attributable to common stockholders, before capital transactions, of approximately $300 million in the first quarter of 2007, compared to an increase of $1.0 billion for the same period a year ago. The declines in net income and fair value results were primarily due to losses on mark-to-market items.*
>
> "Throughout the first quarter of 2007 Freddie Mac continued to build long-term shareholder value by strengthening and growing our core business. Our credit guarantee portfolio showed strong growth in the first quarter and we seized market opportunities to grow our retained portfolio prudently. While the full impact of the housing downturn has not been felt, our credit position has remained strong relative to our historical levels and the market as a whole," said Richard F. Syron, chairman and chief executive officer.
>
> "Freddie Mac continued to serve its vital housing mission by providing stability and liquidity to a national housing finance system facing considerable challenges," Syron continued. *"I'm particularly proud that our company took a leadership role in the subprime mortgage market, announcing new underwriting standards and products and committing to purchase up to $20 billion in mortgages to support subprime borrowers."*
>
> "Earlier this year we promised to return to quarterly financial reporting in 2007, and with the release of our first quarter results

43

today, we've done that," said Buddy Piszel, chief financial officer. "We're making measurable progress on our financial remediation program, and we are confident that we will be timely with our release of full year 2007 results within 60 days of year end. This positions us well to begin the SEC registration process in mid 2008. We're also pleased to have been able to continue returning capital to our shareholders through the repurchase of our common shares.

"While significant mark-to-market losses on our portfolio of derivatives, which are used to hedge our interest-rate risk, and on our credit guarantee activities have resulted in a GAAP loss, we remain encouraged with the underlying fundamentals of Freddie Mac's business," Piszel continued.

Worsening expectations for mortgage credit risk had an adverse impact on the company's GAAP and fair value results. The majority of this effect was due to mark-to-market losses associated with wider credit spreads on mortgage assets in the company's guarantee portfolio. Overall, Freddie Mac's credit guarantee portfolio continued to exhibit credit characteristics that were better than historical averages as measured by current delinquencies, loan-to-value ratio (LTV), and charge-offs.

Freddie Mac's regulatory core capital was estimated at $36.2 billion at March 31, 2007, which represented an estimated $2.0 billion in excess of the 30 percent mandatory target capital surplus set by the Office of Federal Housing Enterprise Oversight (OFHEO).

Fair value of net assets attributable to common stockholders was $25.4 billion at March 31, 2007.

\*     \*     \*

Lower net income, year-over-year, was primarily due to higher mark-to-market losses on the company's portfolio of derivatives and on the company's single-family credit guarantee business. Revenues generated by the company's retained portfolio and credit guarantee portfolio declined modestly from first quarter 2006, as a decline in net interest income was partially offset by increased management and guarantee income. Expenses increased mainly as a result of higher administrative costs associated with improving the company's internal financial reporting and controls infrastructure, and higher credit costs.

\*     \*     \*

During the first quarter of 2007, the unpaid principal balance of the company's retained portfolio increased at an annualized rate of 6.0 percent to approximately $714 billion, as liquidations slowed and wider net mortgage-to-debt option-adjusted spreads (OAS) generally increased investment opportunities. In August 2006, the company and OFHEO announced that effective July 1, 2006, the company would begin managing the retained portfolio under a voluntary growth limit. The carrying value of the retained portfolio was approximately $9 billion below the voluntary growth limit at March 31, 2007.

*     *     *

The company's total credit guarantee portfolio increased at an annualized rate of 16.1 percent to approximately $1.5 trillion at March 31, 2007. The company estimates that its share of government sponsored enterprise (GSE) mortgage securitizations for the first quarter of 2007 was approximately 46 percent, compared to approximately 45 percent for the first quarter of 2006.

Credit-related expenses, consisting of provision (benefit) for credit losses and real estate owned (REO) operations expense, were $193 million in the first quarter of 2007, compared to $60 million (excluding the reversal of Hurricane Katrina reserves of $84 million) in the first quarter of 2006. *The year-over-year change primarily resulted from an increase in the company's provision for credit losses. This increase largely reflects deteriorating credit on 2006 mortgage purchases that have exhibited higher transition rates from delinquency to foreclosure and higher loan loss severities associated with slower home price appreciation and higher unpaid principal balances. Over time the company expects future charge-offs to increase from today's very low levels.*

Included in other non-interest expense are mark-to-market losses of $314 million compared to losses of $67 million in the first quarter of 2006. These increased losses reflect the impact of lower market prices on non-performing loans purchased out of guaranteed securities, as well as the impact of higher expected credit and other costs reflected in the market-based valuations of the guarantee obligation associated with new single-family mortgage securitizations.

A portion of these mark-to-market losses reflects market uncertainty in the pricing of mortgage credit at March 31, 2007, and accordingly implies higher credit losses than the company expects to ultimately incur.

## Capital Management

Estimated regulatory core capital was $36.2 billion at March 31, 2007, which represented an estimated regulatory minimum capital surplus of $9.9 billion, and an estimated $2.0 billion in excess of the 30 percent mandatory target capital surplus set by OFHEO. During the first quarter of 2007, the company issued $1.1 billion of non-cumulative, perpetual preferred stock and redeemed $0.6 billion of higher-cost non-cumulative, perpetual preferred stock.

Following the release of the company's full year 2006 financials, Freddie Mac initiated the repurchase of common stock in accordance with its authorization to repurchase up to an additional $1 billion of common stock in conjunction with the issuance of up to an additional $1 billion of non-cumulative perpetual preferred stock. In April, the company issued $500 million of non-cumulative perpetual preferred stock and through the end of May, repurchased approximately $750 million of additional common stock (approximately 11.9 million shares) at an average price of $63.23.

## Internal Controls

Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues to be a top corporate priority in 2007. The company is continuing to make progress on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to timely quarterly financial reporting. Efforts made to date have resulted in a strengthened control environment.

The company has made significant progress in addressing its internal control issues. For example, it has addressed the material weakness related to the adequacy of its staffing by adequately filling the company's critical vacancies in areas related to controls and financial reporting. Additionally, the company has addressed the significant deficiency related to governance over new products processes by redesigning the process and controls over the implementation of new products.

79.    However, on August 30, 2007, the Company appeared to make an abrupt turn around in its second quarter. In a press release entitled "Freddie Mac Releases Second Quarter 2007 Financial Results; Net Income of $764 million, Fair Value Increase of $800 Million," the

Company stated, in relevant part:

> McLean, VA – Freddie Mac (NYSE:FRE) today reported second quarter net income of $764 million, or $1.02 per diluted common share, compared to net income of $1.4 billion, or $1.93 per diluted common share, for the same period in 2006. The company also reported an increase in fair value of net assets attributable to common stockholders, before capital transactions, of approximately $800 million for the second quarter, compared to an increase of $1.4 billion for the same period a year ago. Compared to the first quarter of 2007, the company reported increases in both net income and growth in fair value primarily due to gains on mark-to-market items.
>
> "Freddie Mac was created to provide liquidity, stability and affordability to the mortgage market in good times and bad," said Richard F. Syron, chairman and chief executive officer. "Rarely has that role been as important as it has been during this period of volatility in the U.S. housing and residential mortgage markets. Furthermore, we have been able to serve the market while maintaining a disciplined approach to risk."
>
> "Our business volumes for the quarter were strong, with continued growth in our credit guarantee portfolio and improved commitments for our retained portfolio. And we are seeing a shift in the market back to more traditional products, including larger volumes of fixed-rate mortgages," Syron continued. *"On the credit front we are seeing weakening, but we are well positioned relative to the overall marketplace to weather the ongoing disruptions in the mortgage markets and emerge as an even stronger player. Most important, we are working with our regulator, our customers and others to do our part in developing a market oriented response that will help provide stability, liquidity and affordability to the national housing and mortgage markets."*
>
> "In June, when Freddie Mac resumed quarterly financial reporting, we committed to continue to reduce the time it takes us to close our books and report our financial results," said Buddy Piszel, chief financial officer. "We have accelerated our second quarter release by two weeks compared to the first quarter and expect to release our third quarter results before Thanksgiving."
>
> Freddie Mac's regulatory core capital was estimated at $36.3 billion at June 30, 2007, which represented an estimated $1.8 billion in excess of the 30 percent mandatory target capital surplus set by the Office of Federal Housing Enterprise Oversight

(OFHEO).

Fair value of net assets attributable to common stockholders was $25.1 billion at June 30, 2007, compared to $25.4 billion as of March 31, 2007.

<p style="text-align:center">*  *  *</p>

Lower net income, year-over-year, was primarily due to a higher provision for credit losses and mark-to-market losses on credit-related items.   Within total revenues, net interest income was essentially flat when compared with the first quarter of 2007 and management and guarantee income continued to grow from prior period levels.

<p style="text-align:center">*  *  *</p>

During the second quarter of 2007, the unpaid principal balance of the company's retained portfolio decreased at an annualized rate of one percent to approximately $712 billion, as liquidations increased and relatively tight mortgage-to-debt option-adjusted spreads (OAS) early in the quarter limited net growth in settled positions.  Late in the second quarter, wider mortgage-to-debt OAS presented more attractive investment opportunities, resulting in an increase in net purchase commitments during the month of June. Freddie Mac continues to manage the retained portfolio within its voluntary temporary growth limit.

<p style="text-align:center">*  *  *</p>

The company's total credit guarantee portfolio increased at an annualized rate of 15 percent in the second quarter of 2007 to approximately $1.6 trillion at June 30, 2007.  This compares to forecasted annual growth in total U.S. residential mortgage debt outstanding of approximately six percent in 2007.

<p style="text-align:center">*  *  *</p>

Credit-related expenses, consisting of provision for credit losses and real estate owned (REO) operations expense, were $336 million for the second quarter of 2007, compared to $63 million for the second quarter of 2006. *The year-over-year increase primarily resulted from the recognition of a $320 million provision for credit losses during the second quarter of 2007.  This increase largely reflects credit deterioration on 2006 and 2007 loan originations that have exhibited higher transition rates from delinquency to foreclosure and higher loan loss severities resulting from slower home price appreciation and higher*

<p style="text-align:center">48</p>

*unpaid principal balances*.

For the second quarter of 2007, other non-interest expense included losses on certain credit guarantees of $187 million, compared to losses of $52 million in the second quarter of 2006, primarily related to higher fair values of credit costs recognized on certain guarantees associated with new business activity. *Also included in other non-interest expense were losses on loans purchased of $205 million, compared to losses of $21 million in the second quarter of 2006, largely due to an increase in the volume of non-performing loan purchases and a decline in the fair value prices of non-performing loans purchased out of PC pools during the quarter.*

## Capital Management

Estimated regulatory core capital was $36.3 billion at June 30, 2007, which represented an estimated $9.8 billion in excess of the regulatory minimum capital requirement, and an estimated $1.8 billion in excess of the 30 percent mandatory target capital surplus set by OFHEO. In accordance with the previously announced authorization to repurchase up to $1 billion of common stock in conjunction with the issuance of up to $1 billion of non-cumulative perpetual preferred stock, the company repurchased $750 million of common stock (approximately 11.9 million shares) at an average purchase price of $63.23 per share and issued $500 million of non-cumulative, perpetual preferred stock during the three months ended June 30, 2007.

During the third quarter of 2007, the company completed its repurchase plan, buying $250 million of common stock (approximately 4.2 million shares) at an average purchase price of $58.74 per share and issuing another $500 million of non-cumulative, perpetual preferred stock.

\*          \*          \*

## Internal Controls

Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues to be a top corporate priority in 2007. The company is continuing to make significant progress on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to timely quarterly financial reporting. Efforts made to

date have resulted in a strengthened control environment.

80. In the next three weeks, two of Freddie Mac's directors, defendants McQuade and Peek, resigned from the Board.

81. Finally, on November 20, 2007, the Company admitted the severity of its exposure to the subprime crisis. In a press release entitled "Freddie Mac Reports Third Quarter 2007 Net Loss of $2.0 Billion or $3.29 Per Diluted Share," the Company stated, in relevant part:

> McLean, VA – *Freddie Mac (NYSE:FRE) today reported a net loss of $2.0 billion, or $3.29 per diluted common share, in the third quarter of 2007,* compared to a net loss of $715 million, or $1.17 per diluted common share, for the same period in 2006. *The company also reported a decrease in the fair value of net assets attributable to common stockholders, before capital transactions, of approximately $8.1 billion for the third quarter of 2007, compared to an increase of approximately $300 million for the same period in 2006. Compared to the second quarter of 2007, the company reported declines in both net income and fair value primarily due to increased credit-related expenses and losses on mark-to-market items.*

> "Without doubt, 2007 has been an extremely difficult year for the country's housing and credit markets and, as our third quarter financial results reflect, we have been impacted by the deterioration in these markets," said Richard F. Syron, Freddie Mac chairman and chief executive officer. "We recognized the challenges facing the mortgage markets, however, and have taken further steps to address them. At the same time, as our charter mandates, we have continued to meet our mission by playing a stabilizing role in the markets and supporting our customers.

> "Freddie Mac is a housing finance company operating in what today is a troubled housing and credit market. It will take time for this market to turn around. But as it improves, we are optimistic about Freddie Mac's longer-term prospects. The market shift towards fixed rate originations and improved pricing and credit standards should position us well as the weakness in credit markets begins to improve and we are able to leverage our traditional strengths."

> "Weakening house prices and deteriorating credit have hurt Freddie Mac's results, as well as those of other participants in the mortgage market," said Buddy Piszel, chief financial officer. "You

can see the impact of these trends in our credit results and throughout our financial statements. Year-to-date, we have recognized $4.6 billion in net credit-related items on a pre-tax basis.["]

"During the past year we have taken important steps to address the impact of the declining housing and credit markets to our business," Piszel added. "We have begun raising prices, tightened our credit standards and enhanced our risk management practices. We also continue to improve our internal controls as we move closer to completing our remediation efforts and returning to timely financial reporting. These actions position us well to take advantage of opportunities when the current market dislocation ends."

Freddie Mac's regulatory core capital was estimated at $34.6 billion at September 30, 2007, which represented an estimated $8.5 billion in excess of the regulatory minimum capital requirement, and an estimated $0.6 billion in excess of the 30 percent mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (OFHEO).

*     *     *

The increased net loss, year-over-year, was primarily due to higher credit-related expenses and mark-to-market losses on the company's portfolio of derivatives and credit-related items.

During the third quarter of 2007, the unpaid principal balance (UPB) of the company's retained portfolio increased at an annualized rate of one percent to approximately $713 billion, as liquidations decreased and wider net mortgage-to-debt option-adjusted spreads (OAS) generally increased purchase opportunities. *During the third quarter, Freddie Mac reduced the balance of its cash and short-term investments portfolio by $30 billion, which helped the company manage its capital and invest in mortgage-related securities with wider OAS. Capital constraints during the quarter limited Freddie Mac's ability to take advantage of purchase opportunities for the retained portfolio and in September the company sold approximately $20 billion in UPB of retained portfolio assets to manage to the 30 percent mandatory target capital surplus.*

*As in September, retained portfolio sales in October 2007 of approximately $25 billion largely reflected activities to manage to the 30 percent mandatory target capital surplus. During the remainder of 2007, the UPB of the retained portfolio may decline*

*given the impact of the continued earnings volatility created by the current market environment and the need to manage to the 30 percent mandatory target capital surplus.*

\*       \*       \*

The company's total credit guarantee portfolio increased at an annualized rate of 18 percent in the third quarter of 2007 to approximately $1.7 trillion at September 30, 2007.   Through October 31, 2007, the company's total credit guarantee portfolio increased at an annualized rate of 16 percent to approximately $1.7 trillion.  This compares to forecasted annual growth in total U.S. residential mortgage debt outstanding of approximately six percent in 2007.

During the third quarter of 2007, the company recorded mark-to-market losses totaling $2.7 billion on items included in other non-interest income (loss), compared to mark-to-market losses of $1.5 billion in the third quarter of 2006.  Of the mark-to-market losses during the third quarter of 2007, approximately $1.4 billion were related to the impact of widening credit spreads on the value of the company's credit guarantee activities and approximately $1.4 billion were related to the impact of declining long-term interest rates on the value of the company's derivatives portfolio.

\*       \*       \*

*Credit-related expenses, consisting of provision for credit losses and real estate owned (REO) operations expense, were $1.2 billion for the third quarter of 2007, compared to $112 million for the third quarter of 2006.   This increase reflects observed credit deterioration, particularly on 2006 and 2007 mortgage loan originations that have exhibited higher transition rates from delinquency to foreclosure, and higher expected severities of losses on a per-property basis resulting from slower home price appreciation and higher UPBs on those loans generating losses.*

Total credit losses, consisting of net charge-offs plus REO operations expense, were $126 million for the third quarter of 2007 and $263 million for the nine months ended September 30, 2007. Realized credit losses were 3.0 basis points of the average total mortgage portfolio for the third quarter of 2007 and 2.2 basis points of the average total mortgage portfolio for the nine months ended September 30, 2007. *The company expects credit losses to continue to increase for the remainder of 2007 and in 2008, especially if conditions, such as home prices and the rate of home sales, continue to deteriorate.*

For the third quarter of 2007, other non-interest expense included losses on certain credit guarantees of $396 million, compared to losses of $103 million in the third quarter of 2006, primarily related to higher market-measured future credit costs on newly-issued PCs.  Also included in other non-interest expense were losses of $483 million on loans purchased out of PC pools, compared to losses of $30 million in the third quarter of 2006, largely due to an increase in the volume, and a decline in the estimated fair value, of non-performing loans purchased out of PC pools during the quarter.  During the third quarter of 2007, the company recognized $58 million in net interest income on re-performing loans previously purchased and $109 million in other non-interest income associated with the recapture of previously recognized market value losses on purchased loans due to borrower payments or higher realized loan foreclosure values.

**Capital Management**

Estimated regulatory core capital was $34.6 billion at September 30, 2007, which represented an estimated $8.5 billion in excess of the regulatory minimum capital requirement, and an estimated $0.6 billion in excess of the 30 percent mandatory target capital surplus directed by OFHEO. Retained portfolio sales in September and October largely reflected activities to manage to the 30 percent mandatory target capital surplus.

As a result of GAAP losses and in order to manage to the 30 percent mandatory target capital surplus and respond to regulatory concerns, as well as to have the flexibility to effectively manage its business, the company is planning on taking several actions.  First, the company has engaged Goldman Sachs and Lehman Brothers as financial advisors to help it consider very near term capital raising alternatives.     Second, the company is seriously considering reducing its fourth quarter common stock dividend by 50 percent. If these measures are not sufficient to help the company manage to the 30 percent mandatory target capital surplus, then the company may consider additional measures in the future such as limiting growth or reducing the size of our retained portfolio, slowing purchases into our credit guarantee portfolio, issuing additional preferred or convertible preferred stock and issuing common stock. When market conditions improve and Freddie Mac returns to sustainable profitability, the company will consider increasing the common stock dividend and returning capital to its shareholders through, among other things, calling preferred stock.

\*       \*       \*

During the third quarter of 2007, the fair value of net assets attributable to common stockholders, before capital transactions, decreased by approximately $8.1 billion, compared to an increase of approximately $300 million in the third quarter of 2006.

Attribution of changes in fair value relies on models, assumptions, and other measurement techniques that evolve over time. The following attribution is the company's current estimate of the items presented (on a pre-tax basis) and excludes the effect of returns on capital and administrative expenses.

Investment activities in the company's retained portfolio decreased fair value by approximately $5.9 billion during the third quarter of 2007, compared to an increase in fair value of approximately $500 million during the third quarter of 2006. These estimates include a reduction in fair value of approximately $8.0 billion attributable to net mortgage-to-debt OAS widening in the third quarter of 2007. Of this amount, approximately $3.5 billion was related to the impact of the net mortgage-to-debt OAS widening on the company's portfolio of non-agency mortgage-related securities.

Mortgage-to-debt OAS widening increases the likelihood that, in future periods, the company will be able to recognize core spread income from its investment activities at a higher spread level. In the third quarter of 2007, the company estimated it recognized core spread income at a net mortgage-to-debt OAS level of approximately 60 to 70 basis points, compared to approximately 25 to 30 basis points estimated in the third quarter of 2006.

Credit guarantee activities decreased fair value by an estimated $6.4 billion during the third quarter of 2007, compared to a decrease in fair value of an estimated $400 million during the third quarter of 2006. These results include amounts related to net cash flows received, as well as changes in the fair value of the single-family guarantee asset and obligation.

\*     \*     \*

**Internal Controls**

Remediation of the material weaknesses and significant deficiencies in Freddie Mac's financial reporting process continues to be a top corporate priority in 2007. The company is continuing to make progress on a series of initiatives to improve its financial reporting infrastructure and remediate material weaknesses and other deficiencies in its internal controls. These activities are part of Freddie Mac's comprehensive plan for returning to timely

quarterly financial reporting. Efforts made to date have resulted in a strengthened control environment.

82.    On the same day, the Company held a conference call discussing its financial results for the third quarter, wherein defendants Syron, Cook and Piszel made the following, among other, prepared statements:

> DICK SYRON, CHAIRMAN & CEO, FREDDIE MAC: Thanks Ed, and good morning to all of you. I know everyone has had a chance to review the press release we posted earlier this morning. As you know, the third quarter continued to represent a very difficult environment as falling housing prices, deteriorating mortgage credit, continued volatility in the fixed income market all contributed to a net loss of $2 billion. Given the continuation of the same market trends that produced these results through October and November, it its likely that the fourth quarter will prove difficult as well.   These results are not surprising, given the vagaries of our accounting that were tied to the housing accounting - to the housing economy and we are taking strong steps to improve our business and our future financial results. We do not believe it would be wise to be sanguine about the intermediate term housing market. Thus, we are determined to take strong steps and be in front of whatever happens.   We are all very strong believers in both the long-term opportunities for shareholders and in our obligations in times like this to meet our charter by stabilizing markets.
>
> *       *       *
>
> PATTI COOK, CHIEF BUSINESS OFFICER, FREDDIE MAC:
>
> *       *       *
>
> Let's turn to the current market environment and its impact on our G-fee business. On slides eight and nine, we have updated the information we provided on our second quarter call. As in June, our current credit position remains relatively strong across our total portfolio.  In aggregate, Freddie Mac benefits from a very low current LTV ratio of 60%, high average FICO scores of 724, and a serious delinquency rate of just 51 basis points, a level that is roughly half of the market average.  However, *our 2006 and 2007 books are expected to realize higher expected default costs than prior books for two reasons.  First, the recent weakening in the house price -- of house prices have increased expected default costs for the 2006 and 2007 books compared to prior years.*

*Second, there was an increase with risk layering mortgages. For example, mortgages with FICO scores less than 620 and original LTVs greater than 90, are more concentrated in the 2007 book and represent about 1% of purchases.*

On the guarantee fee business, we use market prices to mark all credit related exposures. In the third quarter, the market prices for credit deteriorated significantly and I believe that the market is putting a big risk premium into the price they quote, especially on prime conventional mortgages. Let me put this in perspective. The guarantee obligation including related items was $16.8 billion at the end of September. For this value to represent the present value of future default costs on our guarantees, we would need to see default rates in the 4 to 5% range and severities around 30%.

A more reasonable assumption might be defaults of 3 to 3.5% and severities of 30%, resulting in total present value of default costs of $10 billion to $20 billion over the life of the portfolio. This is with some areas such as California experiencing declines in house prices of 25 to 30%. To put this in perspective, our worst performance was the portfolio we held as of 1991, which went on to experience a 2.6% default rate and a severity of about 30%. So we would need to experience a scenario approximately twice as severe as the 1990s to see the GO realized.

Also a note of caution, when comparing these lifetime numbers to charge-offs, this type of analysis includes not only charge-offs but also REO expense and lost interest. So to summarize, the difference between the $10 billion to $12 billion that I quoted and the $16.8 billion can be thought of as an expression of the market's uncertainty about the future, which manifests itself in wider spreads. So unless the conventional conforming default rate rises to a level of 4 to 5%, we would expect to earn some of the GO mark back over time. And remember, as of now, we are seeing single-family serious delinquencies as of September 30, 2007 of 51 basis points.

*To address the declining profitability that results from the decline in the housing market, we have taken steps throughout 2007 to increase prices and limit our credit exposure.* In our bulk purchase channel, we were able to respond quickly to the changing market dynamics. *Early in the year we began restricting the credit terms and increasing prices for purchases through bulk.* G-fees in this space have nearly doubled for similar products since the beginning of the year, dramatically improving expected ROEs. *While this bulk channel accounts for only about 15% of our total purchases, it accounts for a disproportional share of our lower*

*credit quality purchases*. This contributed to the increase on new purchases and our average G-fee up to the mid-20s for the third quarter of 2007.  This number includes contractual G-fees and amortization of delivery fees but does not include non-cash items, such as accrual of day one differences.

*For our flow purchases, given the prevalence of long-term contracts that govern our purchases in that space, implementing credit and price changes is more challenging. However, we have taken two significant steps. In August, we raised prices for loans with higher risk characteristics. And last week we expanded our delivery fees to include fees on LTVs greater than 70% and FICO scores below 680.*  This would have the effect of increasing fees on our current deliv-eries by 3 to 5 basis points, depending on delivery mix.  *We are also discontinuing the purchase of no income, no asset (or NINA loans) and reinforcing our declining market's requirements.*  We will continue to review all of our pricing on an ongoing basis. In sum, while the housing market remains challenging, we are comfortable with our ability to adjust prices and terms of business, to enhance the profitability of our securitization business going forward.

Let's turn to a discussion of the risk profile and profit outlook for the retained portfolio.  The credit profile of our retained portfolio remains of the highest credit quality with 57% in agency mortgages and 33% in non-agency securities, of which 97% is AAA rated and does not include any CDOs. These asset-backs are critical to our ability to meet our affordable lending objectives and allowed us to invest in non-prime markets with substantial credit enhancements.  Despite the continued deterioration of the housing market and increases in non-prime delinquencies, we remain comfortable with our risk position on these assets. For the subprime securities, while we have experienced some downgrades, we have high levels of subordination that support these investments, as shown on slide ten.  Even at a 50% cumulative default rate and 50% severity assumption, no losses are projected on these securities.  There are also about $26 billion of Alt-A and $21 billion of MTA asset-backed securities in the portfolio, which we have grouped together in this slide with an average suborder -- with average subordination levels of 16% and 22% respectively. While the overall book should have sufficient subordination to withstand continued deterioration in housing and performance, there are some chances of losses, although unlikely, on a few individual bonds, given the variation in subordination levels.

Let me turn to OAS and fair value. Despite its high credit quality, the retained portfolio has experienced significant spread widening

during 2007. ***In the third quarter alone, the portfolio was marked down by $8 billion on a fair value basis as spreads widened, bringing the year-to-date write-down to about $9 billion. This represents about a 40 basis point widening on the entire portfolio.*** There is always some good news and bad news in these markdowns. The bad news is the fair value mark-to-market write-down it creates. The good news is the higher spread income that will accrue going forward, coupled with improved opportunities. At the beginning of the year, the spread in the portfolio was about 25 to 30 basis points. At the end of September, it was about 65 to 70 basis points. Thus, the spread the portfolio was earning going forward is about 2.5 times higher.

While capital constraints are currently restricting our purchase activities, we are optimizing our purchases and select sales against runoff to maximize the OAS on the portfolio. Two examples during the third quarter were, first, the purchase of AAA bonds against the sale of agency pass-throughs and, second, the purchase of cheap agency ARMs in August against fixed-rate pass-throughs. Both transactions resulted in significant option-adjusted spread pick-up. We will continue to look for these kinds of opportunities and also add responsibly to the portfolio as we address our capital situation.

* * *

BUDDY PISZEL, CFO, FREDDIE MAC:

Thanks Patti, and good morning everyone. I'm going to take a few minutes to provide a high level review of our third quarter 2007 GAAP and fair value results, shown on slide two. I'll keep this brief, because I want to focus most of my comments on credit. Let's begin with the GAAP results. The key takeaways here are that while we've continued to experience improvements in net interest income and guarantee fees, ***the combination of negative marks in our derivatives and credit related items, as well as higher provisions for credit losses produced a quarterly net loss of $2 billion or $3.29 per share.***

* * *

Moving to our management and guarantee income, line two shows that we experienced good growth in revenues on third-party owned PCs, which brought our top line guarantee revenues to $520 million or 16.6 basis points, up from $474 million or 15.7 basis points in the second quarter. This line includes only contractual G-fees on third-party PCs. Amortization of deferred fees would have

added 1.4 basis points, yielding an overall G-fee of 18 bps. As a reminder, we do not include any contribution from non-cash accretion of day one losses in our guarantee fees. *During the third quarter, we recorded $1.5 billion in interest-rate related mark-to-market losses, shown here on line three. Remember, we manage our interest rate exposures to very low levels. The reported losses on derivatives are economically offset by gains on our debt funding programs and retained portfolio securities. These offsetting gains are not reflected in the GAAP income statement. So again, for another quarter, our reported results have been significantly depressed by mark-to-market effects.*

This GAAP accounting depresses our regulatory core capital, which is necessary for growth. It's also made it more difficult to communicate our results externally. While the work isn't complete, I can tell you that we're taking two steps to address this problem. First, I've asked my team to start building a framework for reinitiating hedge accounting on our portfolio of driver derivatives. That, plus selective adoption of the fair value option will dampen some, not all, of this noise. Second, as we have discussed with many of you, we have also made good progress on developing segment reporting and an adjusted GAAP measure that will present our Company's results more clearly. As part of this presentation, we are currently planning to adjust out unrealized derivative mark-to-market items and simply recognize realized gains and losses as they would emerge over the life of the portfolio. Delivering this presentation requires a re-measurement of past results, with an accompanying MD&A. We're doing our utmost to roll out this presentation by year-end. But if this work jeopardizes our release of results in 60 days, it will be provided after the year-end release. We will meet our 60-day year-end commitment.

*Moving to lines four and five, the total credit impact on our GAAP results in the third quarter totaled $3.5 billion. On a year-to-date basis, we have absorbed $4.9 billion of total credit costs. I will discuss that thoroughly in a minute. Let me now turn to our fair value results on line six. You can see we recorded a net reduction in our fair value of common equity before capital transactions of $8.1 billion after tax in the third quarter. Included in this result was OAS widening in the retained portfolio, which contributed a pretax reduction of approximately $8 billion, $3.5 billion of which was associated with a widening of OASs on our portfolio of ABS securities.* As Patti discussed, we believe that little, if any, of this fair value loss will result in cash losses. So we expect most of this mark will be timing differences, as improved core spread income in the retained portfolio during the quarter and going forward will reverse these

losses.

*Our guarantee fee business experienced a $7 billion pretax reduction in value, due to significant declines in the market value of the net guarantee asset and guarantee obligation and widening credit spreads and the lower market prices on our portfolio of delinquent loans. This resulted in a GO that Patti referred to of approximately $17 billion, which overstates what we expect to become realized credit losses. A more reasonable outcome is $10 billion to $12 billion.* I think there was a glitch in Patti's script when she gave $10 to $20 billion. She meant $10 to $12 billion. Having given a high level review of our GAAP and fair value results, let me now turn to credit, beginning with slide three. This slide frames the way the Company currently accounts for credit costs. In the upper box, line one is our credit provision, which for the most, part addresses our off-balance sheet single-family credit exposure. Year-to-date, we took approximately $1.7 billion in provision expense, with the bulk of that recorded in the third quarter. I'll explain that third quarter increase in a minute.

\*       \*       \*

We have said in past calls that our 2006 and 2007 books have worse credit attributes than previous year vintages and, right out of the blocks, were hit by negative price declines. As a result, early delinquency and transition rates on these recent books are outsized compared to historical patterns. We have chosen to give credibility to these observed trends and have made a number of changes to our reserving methodology in response. These changes for the 2006 and 2007 books are the biggest driver in our provision increase. On slide four, you can see that our year-to-date charge-offs, which are the most lagging credit indicator, include a small percentage from the '06 and '07 books. However, for our serious delinquencies, the '06 and '07 books account for 23% of the total, which is much higher than historical early performance. We've experienced down cycles before in the credit markets and in hindsight you always wish you would have reacted more quickly. We've done that. As a result, 67% of our adjusted reserve is attributable to our 2006 and 2007 books.

On slide five, we give you a forward look of charge-offs. Remember, at the end of the day, no matter what the bookkeeping method, our credit losses emerge in this charge-off line. The total credit costs in dollars shown here assume that the '08, '09 purchases do not contribute to losses in '08 or in '09. So on line one, you can see charge-offs continuing to rise through the end of the year and end the year at approximately $350 million. Adding

REO expense, that equates to a full-year total credit cost of roughly $500 million or 3 basis points of the portfolio, in line with our expectations. For projecting forward, we are using the less severe realization and severity rates and house price paths Patti referred to earlier, which equate to about $10 billion of total expected future GAAP credit costs for this book.

*For 2008 and 2009, total credit losses grow significantly, rising from 8 basis points in '08 to 11 basis points in 2009.* We have not provided the out years, but I can tell you that 2009 is the peak charge-off year for the closed book and then charge-offs start sloping downward. What's important here is that when we think about our adjusted reserve, it's based on our view of the forward-looking charge-offs for incurred losses. You can see here that at $2.6 billion, our adjusted reserve will cover roughly the next two years of charge-offs. Let me close the credit story on slide six with a discussion of our losses on loans purchased or LIA loans. When we buy 120-day delinquent loans out of our securities, we put them on the balance sheet at the market's view of fair value. We have always used the market's view versus our model's view. And you can see that, as credit conditions have worsened, the market's pricing for these loans have declined dramatically. These prices again reflect the severe market sentiment that Patti discussed.

<div align="center">*     *     *</div>

So let me summarize our credit story. *Credit has clearly worsened. We have taken over $4.6 billion in credit costs year-to-date, which is almost 50% of the $10 billion we expect to ultimately incur.* The mark-to-market items have been extreme. We believe an adjusted provision is the right way to look at credit and our actions there have been responsive to what we have seen and prudent.

Before I turn to capital, let me provide some insight into the fourth quarter. And as Dick said, so far in the quarter, market conditions are working against us. Loan rates have rallied and OAS and credit spreads have continued to widen. *So unless market conditions improve, fair value returns will be negative and with no changes in our accounting, our GAAP results will also be negative. At this point, we're projecting fourth quarter performance about in line with the third quarter.* Which brings me to capital. As of September 30th, we had $8.5 billion of capital over the statutory mini-mum capital, but only $600 million over the 30% mandatory capital surplus target.

*Given the opportunities to deploy capital, and uncertainty of our*

*GAAP results and credit conditions, as well as un-certainties on the relief of the 30%, we are planning on taking several actions to bolster our capital. First, we have engaged Lehman Brothers and Goldman Sachs to help us consider capital raising alternatives in the very near term. Second, we are seriously considering a 50% reduction in our common dividend.*

83.    Following the preceding prepared remarks, Defendants Syron, Cook and Piszel

entertained the following analyst's questions, among others:

> DAVID HOCHSTIM, ANALYST, BEAR STEARNS: Hi. It's actually David Hochstim.  Could you just address the idea that you're briefly suffering from wider credit spreads through reductions in GAAP capital. You can't take advantage of those wider spreads fully because your capital has been eroded, so you can't buy those high return assets. And yet, you've got $8.5 billion of surplus capital above the statutory minimum. Why isn't the best thing for shareholders to get relief from that arbitrary 30% cushion that the regulators impose.  You're virtually compliant with the agreement.  In fact, you've been in compliance with the written agreement you had in June.  So why shouldn't there be some adjustment to that supposedly temporary capital restriction?

> DICK SYRON: Well, David, you have addressed a very key issue, obviously, and the issue you have addressed has underneath it that *we have the opportunity now to put profitable business on the books, but we're constrained by capital. And that is a major factor.* Look, I mean, we don't think this is very pleasant thing to say, what we're doing here, in terms of major capital actions, considering dividend reductions.  But we wouldn't be doing it unless we thought we were going to make money on it. And that's the motivation for it.  With respect to the 30% itself, the 30% is the decision of the regulator.  This is, as you know, the GSE sector as a whole, a highly regulated business and they're the ones that have to determine that.

> Now, looking forward, we are making strong progress towards our compliance plan. As our compliance plan is completed, and we have a 60-day time frame on that, we would expect -- and we get some other things done -- to be-come more aggressive and we do expect to get the 30% back over time, which will obviously both give us more opportunities and put us in a situation where the capital that we have raised now won't be as necessary to hold onto.

<p style="text-align:center">*        *        *</p>

HOWARD SHAPIRO, ANALYST, FOX-PITT KELTON: Hi. I just wanted to follow up on David's question and ask you point blank, did you go to OFHEO and ask for relief on the 30% capital surcharge? You are proposing to dilute shareholders, so please don't tell us that it's a question you do not want to answer on a public call.

DICK SYRON: Well, we respect and abide by our regulators, which isn't how we deal with these things. We have had discussions with them on the 30%. That obviously is a key issue and I would expect that we would be having those discussions as time goes forward.

HOWARD SHAPIRO: Did they say no?

DICK SYRON: You can interpret the answer, I think.

HOWARD SHAPIRO: So the regulators said no. Okay.

<div align="center">*        *        *</div>

ERIC WASSERSTROM, ANALYST, UBS: Thanks. Just to circle back to some of the things that have been said, I mean, given that there's a very, very high likelihood that the trends we have seen so far through the quarter will cause you to violate the 30% excess capital standard in the absence of any other exogenous factor, could you help us prioritize what course of action you would take and put some magnitude around that?

DICK SYRON: Well, at the time the 30% was first put into place, it was put into place with the idea that this is something that one could go through and then come back above and manage on an average basis. So we are not handling this on the basis of, gee, we want to avoid being 29.98% at the end of one month. But our cushion -- and as you know, *we have talked about this extensively and our regulator has commented on it extensively, the need for a cushion above the 30% is sufficiently thin now, that when you combine that with the opportunities that would be foregone, not to be undertaking business, we think the course that we're considering and discussing with our directors on capital is the right one.* One quick point. All right? There are two basic approaches we could take now. We could sort of go to fortress Freddie, shrink the business, which I don't think would be in the interest of the shareholders and certainly not in our interest of our obligation, statutorily under our charter to the U.S. mortgage market, but we could do that. We could not do anything on stock and just shrink the business and wait for it through. Or we could

<div align="center">63</div>

take these actions, which we think are consistent with the best interests of the mortgage market, and with the interest of the shareholders and do it quickly, get in front of the situation, and do it with a magnitude that we think we can get behind us.

ERIC WASSERSTROM: Okay. And in terms -- I mean, given that the -- I mean, Dick, I respect that and I understand that. I'm just trying to get a sense.

DICK SYRON: I'm sorry if I'm too intense about it.

ERIC WASSERSTROM: I can understand why. But I guess given that the dividend cut is actually in the scheme of things a very small number, I'm trying to get a sense of how else you would prioritize the actions and what the potential magnitude of them could be?

DICK SYRON: You know, we have -- I think we have indicated we're talking about doing things in the preferred space. Okay? We have not talked this fully through with our Board. We have obviously talked to our Board, but we haven't gone through the full governing process in a formal sense. So in all due respect, I don't want to get too precise about this. Let me put it this way. We are – we're not happy about this. We don't expect you to be happy about this. But we are trying to do this in a way that's either least worst or most friendly to our existing common shareholders.

84.    As a result of these revelations, Freddie Mac's stock price plunged from a closing price of $37.50 per share on November 19, 2007 to a closing price of $26.74 per share on November 20, 2007 – *a one-day decline of approximately 29%*. Amazingly, this huge drop in the Company's stock price does not even account for the anticipatory drop in Freddie Mac's stock price in the five trading days prior to the November 20, 2007 announcements, which saw Freddie Mac's stock price drop from $44.56 per share on November 13, 2007 to $37.50 per share on November 19, 2007. In total, in just one week, Freddie Mac's stock price declined by 39.9%.

85.    One week later, on November 27, 2007, the Company announced its plan to issue $6 billion in preferred stock in order to provide Freddie Mac with necessary working capital. Specifically, in a press release entitled "Freddie Mac to Offer $6 Billion of Preferred Stock," the

Company stated, in relevant part:

> McLean, VA – Freddie Mac (NYSE: FRE) today announced that it will issue $6 billion of non-cumulative perpetual preferred stock. The issuance will involve a larger offering of non-convertible non-cumulative perpetual preferred stock, and a substantially smaller offering of convertible non-cumulative perpetual preferred stock. Both offerings are expected to price in the near term.
>
> ***Last week, Freddie Mac announced that, in order to meet the 30 percent mandatory target capital surplus directed by the company's safety and soundness regulator, the Office of Federal Housing Enterprise Oversight (OFHEO), as well as to have the flexibility to further its franchise value, it planned to take near-term capital raising actions.  As also announced today, the company has decided to reduce its fourth quarter common stock dividend to $0.25 per share.***
>
> Freddie Mac's estimated regulatory core capital was approximately $34.6 billion at September 30, 2007. Freddie Mac's minimum capital requirement at that date was $26.2 billion and the 30% mandatory target capital surplus was an additional $7.9 billion.  Accordingly Freddie Mac's estimated regulatory core capital at September 30, 2007 represented an estimated cushion of $8.5 billion in excess of the company's regulatory minimum capital requirement and an estimated surplus of $0.6 billion in excess of the 30 percent mandatory target capital surplus imposed on the company by OFHEO.  The capital raised through this offering will be used to bolster the company's capital base in light of actual and anticipated losses necessitated by GAAP accounting requirements and help Freddie Mac meet the 30 percent surplus going forward.
>
> "Freddie Mac is announcing today a proactive capital management plan that will help us meet the 30 percent surplus and address regulatory concerns and GAAP accounting requirements, provide sufficient capital to continue fulfilling our important housing mission through the current market environment, and better position us to effectively manage the company going forward," said Freddie Mac Chairman and Chief Executive Officer Richard F. Syron.

86.     Moreover, despite certain of the Individual Defendants continuing to defend their improper conduct, a December 7, 2007 Washington Post article entitled "'Piggyback' Loans Allowed by Freddie Fed Mortgage Risks" correctly suggested that Freddie Mac's loan policies

during the subprime debacle violated the Company's Charter[3]:

> Before the era of easy credit, home buyers were ordinarily required to come up with down payments, which gave them an equity stake in their property.
>
> That equity reduces the danger of foreclosure, and federal law prohibits Freddie Mac from buying mortgages that cover more than 80 percent of a home's value -- unless the loan comes with a safety net, such as an insurance policy that would kick in if the borrower defaults.
>
> However, in recent years, Freddie Mac permitted home buyers to borrow all or part of the remaining 20 percent by using second loans, called "piggyback" loans, with no safety net.
>
> As early as 2005, an industry group protested that the practice was designed to get around the law and should be stopped.
>
> Regulators allowed it to continue, and Freddie Mac's financial disclosures were silent on the subject until last month, when the company noted that such arrangements could leave borrowers more susceptible to foreclosure.
>
> "[A]s home prices increased during 2006 and prior years, many borrowers used second liens . . . thus avoiding requirements under our charter," Freddie Mac said in a quarterly financial report.
>
> Nothing prohibited Freddie Mac from taking on uninsured piggyback loans, Patricia Cook, Freddie Mac's executive vice president and chief business officer, said in an interview yesterday.
>
> "I don't think we viewed it as our role or responsibility to say to the market that seconds were inappropriate," Cook said.
>
> Loans in piggyback arrangements are "a very small piece" of the company's investment portfolio, and their performance "is markedly better than any of the toxic mortgages that have been originated," said Anthony S. "Buddy" Piszel, Freddie Mac's chief financial officer.
>
> Freddie Mac made the recent disclosure about the effect of second loans because the company has been trying to improve its financial reporting and "felt that it was important information for the market to have," spokesman Michael Cosgrove said.

---

[3] *See* ¶53, *supra.*

The purchase of piggyback loans is one of many factors that has left Freddie Mac exposed to potentially larger losses as a nationwide debt bubble deflates. The McLean company turns out to have been more vulnerable to a downturn in housing prices than it appeared.

Last month, Freddie Mac announced a $2 billion loss for the third quarter. Since early October, the company's stock has dropped 41.5 percent, erasing billions of dollars of shareholder wealth. At a time when some policymakers hoped it would help ease a credit crunch by serving as a loan buyer of last resort, Freddie Mac was selling mortgages to shore up its own financial condition. Last week, it cut the dividend it pays stockholders by half and borrowed $6 billion from investors to meet federal capital requirements.

<p style="text-align:center">*   *   *</p>

Freddie Mac's problems are similar to those weighing on many of the nation's largest financial institutions. In pursuit of profit, and to retain market share, it invested in riskier loans. Some came with the option of low monthly payments that escalated over time. Some required no information about a borrower's income or assets. In many cases, the loans made it possible for people to buy homes they could not otherwise afford.

Now, borrowers are defaulting, foreclosures are mounting, home prices are falling, and easy credit is drying up, feeding a downward spiral.

Freddie Mac's diversification into certain types of alternative loans took a big jump in 2005, well after a 2003 ac-counting scandal exposed deep flaws in the company's internal controls and a new chief executive, Richard F. Syron, was brought in to clean up the mess. In its annual report for 2005, the company said that it expected the alternative loans to default more often than traditional loans and that it had factored in the risk.

Freddie Mac has the potential to influence lending practices by setting conditions for the loans it accepts. But company executives said yesterday that Freddie Mac's power was eroding as investors entered the market.

*Amid a loosening of industry standards, Freddie Mac could not afford to sit back and let the market pass it by, the executives said.*

*"I think what happened over time is, we found that our own caution was making us less and less relevant, and we weren't*

*sure, quite frankly, that our competitors, you know, on the street were being crazy," Piszel, the chief financial officer, said.*

*"Could we have run for the hills and said we're not going to do any of that?" Piszel asked. "What if things didn't go down? We would basically be just taking our whole future and giving it away."*

This year, as the market deteriorated, Freddie Mac's investment in alternative loans grew. For the first nine months of 2007, nontraditional loans made up about a third of Freddie Mac's mortgage purchases, up from almost a quarter in the first nine months of 2006.

Unlike most other players in the mortgage business, Freddie Mac is required to operate under a congressional charter that imposes such restrictions as the 80 percent rule.

That requirement was meant to insulate the company from losses.

"Our principal safeguard against credit losses for mortgage loans" -- apart from insurance and the like – "is pro-vided by the borrowers' equity in the underlying properties," Freddie Mac said in its annual report for 2003.

The relationship between loan size and property value, known as the loan-to-value, or LTV, ratio, is a key measure of loan quality. The company features it in its financial reports, and Syron, the chief executive, cited it in his letter to shareholders for 2006. However, the ratios the company reported over the years did not reflect the combined total of multiple loans on the same property.

Cosgrove, the company spokesman, said they weren't required to.

The company described the potential impact of second loans last month, devoting three sentences to the subject in an 81-page report on its latest financial results.

*Including second loans, Freddie Mac estimated that about one in seven of the single-family mortgages it held on Sept. 30 had total loan-to-value ratios of more than 90 percent, compared with one in 20 if it excluded the piggyback loans.*

*"In general, higher total LTV ratios indicate that the borrower has less equity in the home at the time of origination and would thus be more susceptible to foreclosure in the event of a financial downturn," Freddie Mac said.*

> *The company offered a reassuring note several months earlier in its annual report for 2006. Freddie Mac said loans with "lower levels of borrower equity" carried insurance or other financial backstops.*
>
> *Freddie Mac executives said that point was framed in terms of the company's loan-to-value ratio, which excludes piggybacks, and not total loan-to-value, which includes them.*
>
> *"I would chalk that up to less precision in the disclosure," Piszel said.*

87.    Defendant Piszel's statements in the preceding article are essentially an admission that the Company's financial disclosures had been false and misleading with respect to the loan-to-value ratios of mortgages guaranteed by the Company and/or contained in its "Retained Portfolio."

88.    On December 10, 2007, in a supplement to the Company's information statement dated March 23, 2007, Freddie Mac announced a policy shift in its purchase of mortgages underlying the Company's PCs that had been delinquent for 120 days or more. Specifically, the Company would no longer purchase these delinquent mortgages until: (i) the mortgages had been modified; (ii) a foreclosure sale occurs; (iii) the mortgages are delinquent for 24 months; or (iv) the cost of guarantee payments to security holders, including advances of interest at the security coupon rate, exceeds the cost of holding the nonperforming loans in its mortgage portfolio. Freddie Mac acknowledged that "[t]aking this action will also have the effect of reducing the Company's capital costs. The expected reduction in capital costs will be partially offset by, but is expected to outweigh, greater expenses associated with delinquent loans."

89.    The very next day, on December 11, 2007, Goldman Sachs held a conference attended by Syron and Piszel where Syron essentially admitted the Company's mishandling of its credit risk. Specifically, in response to the question "looking back at the Company's actions in '05, '06 and the first half of '07, when it was pretty clear that credit risk was being priced poorly

from the standpoint of those who where purchasing it, and your portfolio was growing at mid to

high teens' rates. You clearly made a strategic error. Can you talk about looking back on that

time and how you might learn to do better in the future," Syron stated:

> Yes. I think that's a tough question, it's the right question. I think
> it is the right question. Now, it's a tough time. *We didn't do
> everything perfectly. To some extent, some of this we had control
> over, and some we didn't have control over. As you know, and I
> think everybody's got to take a look at this model, the way the
> industry works - the GSE industry - is that we give people a price
> sheet - a price grid, if you want - kind of a year in advance.   And
> then we have a [pay or take] or whatever you want to call it. They
> deliver us the product.  We've contracted that we'll already take
> that – we'll take that.  So we can't in our flow business turn the
> spigot on and off every day and say, Gee - I don't want that
> product.  You could say, even a year before that, when those
> contracts were being established - Should we have tightened up
> on some things? I think the answer is yes, to some extent   It's
> tough, though*.  In '03, our market share dropped to 33%. It's
> pretty tough when the other guy is twice your size.  We came back
> to 43%.  We don't have to draw any lines in the sand.  We're going
> to defend the market share at a certain price.  But you don't want
> to drop to 20% or 25% either.  And market pricing was crazy for
> us the whole sector.  So some of this stuff, you would have had to
> turn the spigot a lot a head of time.
>
> *Where this is, I think, even more though, ability for criticism is
> some of the stuff we took in the bulk business . . . looking back, I
> wish we'd been more pressing and had tightened up on it, to be
> honest about it.  And I think probably there were, at the margin,
> some mistakes, and we're committed to not do it again*.

90.     In response to another analyst's question at the Goldman Sachs conference

regarding the Company's projected losses arising from defaults and whether that would erode the

$6 billion in capital that Freddie Mac raised from its preferred stock offering, Piszel stated:

> Well, you think about timing in which this is going to emerge.
> And I said that we're trying to take some actions, because the big
> way that the credit emerged in the third quarter was on these
> marks. And some of the marks and some of the accounting we're
> trying to get out of because we don't think its representative of
> where, ultimately, the credit will come from and the way it should
> be emerging in the numbers. *So, you're right.  We said that we're*

> *expecting defaults in the $10 to $12 billion range overall. We've*
> *taken $4.5 billion through the first three quarters. So we're*
> *basically halfway there. We're assuming we're going to take the*
> *rest over the next couple of years.*

91.    Then, on February 7, 2008, in a statement before the Senate Banking, Housing

and Urban Affairs Committee, OFHEO Director James B. Lockhart III indicated that he had

warned the GSEs of credit risk concerns before the credit collapse stating "I remember listing

credit risk concerns in an early presentation I did to one of their Boards.  Some members were

mystified that I thought it was an issue given their track record.  I am afraid that was a sign of the

times." Lockhart also stated, in relevant part:

> The risks are beginning to take their toll.  ***Public disclosures***
> ***indicate that Freddie Mac will report annual losses for the first***
> ***time in its history*** and Fannie Mae for the first time in 22 years.
>
> \*        \*        \*
>
> The Enterprises' Response
>
> What have the Enterprises been doing given these challenging
> market conditions? (Chart 2) They have been fulfilling their
> mission of providing stability and liquidity to the secondary
> conforming mortgage market. That has been very critical since
> early August.  They have been securitizing almost a hundred
> billion dollars a month in mortgages as you can see in blue. ***The***
> ***green, which is their mortgage portfolios, has not grown because***
> ***of their internal control and other operational problems and the***
> ***related OFHEO imposed limits with respect to capital and***
> ***portfolios.    Given the market conditions and their progress,***
> ***OFHEO loosened the portfolio limits in September of 2007.***
> ***Despite that added flexibility, the Enterprises have not increased***
> ***their portfolios***.  With accompanying capital they could increase
> their combined portfolios by over $100 billion for the next 6
> months without violating the new limits.
>
> As OFHEO directed, the Enterprises adopted the bank interagency
> guidances on non-traditional mortgages and subprime mortgages.
> The guidances were implemented in September last year.   The
> guidances are not only for all mortgages that the Enterprises
> directly hold and guarantee, but also the underlying mortgages in
> private label securities (PLS) that they acquire. At the same time

we gave portfolio cap flexibility, they agreed to enhance their programs to support the refinancing of subprime into less risky mortgages.

The Enterprises' Conditions

<p style="text-align:center">*    *    *</p>

Freddie Mac had earlier agreed to a consent agreement and the 30 percent extra capital requirement. In July of 2006, they voluntarily agreed to restrict the growth of their portfolio as well. In retrospect, those agreements and, especially, the growth restrictions and the capital requirements, were extremely important in reducing the credit losses at Fannie Mae and Freddie Mac and preventing major disruptions of the conforming loan market system.

*I am pleased to report that both Enterprises have made major progress on these operational remediation efforts, which required billions of dollars and many thousands of consultants, but significant issues remain.*

In OFHEO's 2007 Annual Report to Congress, both Enterprises were rated as having "significant supervisory concerns." They both published third quarter financials for the first time in over three years. The accomplishment was somewhat dampened by the $3.5 billion of losses that they reported for the third quarter. They have both stated that they expect to produce timely financials at the end of this month for 2007 results. Unfortunately, they expect to report significant losses for the fourth quarter.

Credit Risk. Another related change over the period was the growth of credit risk. Operational risk and to a lesser extent market risk had been the key focuses of the Enterprises and they still are extremely important with the volatility of the markets and heavy reliance on models for market and credit risk pricing. *I remember listing credit risk concerns in an early presentation I did to one of their Boards. Some members were mystified that I thought it was an issue given their track record. I am afraid that was a sign of the times.*

*The Enterprises were then reporting credit losses of 1 to 2 basis points, a third of normal levels and now they are approaching double normal levels and climbing. Some of this growth in losses was because they lowered underwriting standards in late 2005, 2006, and the first half of 2007 by buying more non-traditional mortgages to retain market share and compete in the affordable*

*market.* They also have very large counterparty risks including seller/servicers, mortgage insurers, bond insurers and derivative issuers.

*Basis points sound small, but they become important when you are leveraged the way Fannie Mae and Freddie Mac are . . .*

\*      \*      \*

*For the first three quarters of 2007, they have each lost $8 to $9 billion in fair value of equity. Their combined fair value equity at the end of the third quarter was $58 billion compared to $5.1 trillion in mortgage exposure.* I should hasten to add in the fourth quarter they raised almost $14 billion in equity in the form of perpetual preferred stock and cut their dividends as well. That additional capital is critical as *both CEOs recently said at a Wall Street conference, they are going to have very tough fourth quarters and 2008s.*

92.    On February 28, 2008, Freddie Mac announced further losses for the fourth fiscal quarter of 2007 with little hope of recovery in sight. Specifically, in a press release entitled "Freddie Mac Releases Fourth Quarter 2007 Financial Results," the Company stated, in relevant part:

McLean, VA – *Freddie Mac (NYSE:FRE) today reported a net loss of $3.1 billion, or $5.37 per diluted common share, for the year ended December 31, 2007, compared to net income of $2.3 billion, or $3.00 per diluted common share, for 2006. For the fourth quarter of 2007, the net loss was $2.5 billion, or $3.97 per diluted common share, compared to a net loss of $401 million in the fourth quarter of 2006, or $0.73 per diluted common share.*

"Today's economy represents one of the most severe housing downturns in American history, and our results reflect that difficult environment as well as Freddie Mac's steadfast commitment to its important mission of providing liquidity, stability and affordability to the U.S. housing finance system," said Richard F. Syron, Freddie Mac chairman and chief executive officer. "Throughout 2007, Freddie Mac worked tirelessly to protect distressed homeowners by stabilizing the conforming mortgage market and reducing mortgage foreclosures. In addition to leadership on behalf of homeowners, we are keenly focused on managing our business through this difficult cycle towards a stronger future. As a clear sign of our progress, we are gratified that today's release

marks Freddie Mac's return to timely financial reporting, an accomplishment that would not have been possible without the terrific efforts of everyone on the Freddie Mac team."

Looking ahead to 2008, Syron commented, "We remain extremely cautious as we enter 2008. If the economy weakens substantially from here – a possibility for which we need to be prepared as a company – it will have a further negative effect on homeowners across the country and drive credit costs higher. However, we have taken the steps to add capital, tighten our management of credit risk and institute pricing policies that are more consistent with the risk we bear. These actions should help us build the business for the future."

"With our large capital raise in the fourth quarter, we boosted our surplus relative to OFHEO's 30 percent mandatory target capital surplus," said Buddy Piszel, chief financial officer. "In 2008, we will continue to prudently manage our capital, particularly given the outlook for continued weakening in the housing market."

"Likewise, today's release of our full-year 2007 financial results and annual report is significant as it marks Freddie Mac's return to timely financial reporting and is further evidence of the progress the company is making," Piszel said. "We have also enhanced our financial reporting to provide greater clarity and comparability through the adoption of new accounting policies and introduction of a supplemental non-GAAP financial metric, which we call Adjusted operating income. Today, we are presenting these enhancements – including detailed segment information on our Investments, Single-family Guarantee and Multifamily businesses – so as to provide investors with an expanded view of Freddie Mac's business performance."

Consistent with the company's efforts to improve the clarity and comparability of its financial reports, Freddie Mac has made two significant changes in its financial presentation – adoption of new accounting policies and an introduction of a supplemental non-GAAP financial metric. For a more detailed discussion, see the Appendix accompanying this release.

While the accounting methods the company applied before the changes are acceptable, Freddie Mac believes that the newly adopted accounting methods are preferable in that they significantly enhance the transparency and understandability of the company's financial results, promote uniformity in the accounting model for the credit risk retained in its primary credit guarantee business and better align revenue recognition to the release from

economic risk of loss under its guarantee.

\*       \*       \*

**Net loss** was $2.5 billion for the fourth quarter of 2007, compared to a loss of $1.2 billion for the third quarter of 2007. The majority of this increase in loss resulted from significant mark-to-market losses detailed below in the discussions of other non-interest loss and other non-interest expense. Without giving effect to the accounting changes for the company's guarantee obligation discussed above, the fourth quarter 2007 net loss would have been $3.7 billion.

The key components affecting the company's net loss for the fourth quarter of 2007 as compared to the third quarter of 2007 were:

**Net interest income** was $774 million for the fourth quarter, a slight increase from $761 million for the third quarter, primarily due to lower amortization expense, partially offset by lower average balances as the company managed the retained portfolio to the 30 percent mandatory target capital surplus.

**Management and guarantee income** on PCs and Structured Securities was $698 million for the fourth quarter, a slight decrease from $718 million for the third quarter, mainly driven by decreased amortization income.

**Other non-interest loss** increased to $2.1 billion in the fourth quarter, compared to a loss of $601 million for the third quarter. Included in the fourth quarter non-interest loss were mark-to-market losses of approximately $0.8 billion on the value of the company's credit guarantee asset and approximately $2.3 billion on the value of the company's derivatives portfolio, both due to the impact of declining long-term interest rates. The company expects to experience reduced volatility from mark-to-market effects on its guarantee asset and derivatives portfolio as a result of the adoption of SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities, Including an amendment of FASB Statement No. 115" (SFAS 159) (see "Core Capital" below) and, to a lesser extent, the company's planned implementation of hedge accounting. See the Appendix for more detail on the adoption of SFAS 159.

**Administrative expenses** totaled $401 million for the fourth quarter, down from $428 million in the third quarter, primarily due to the reversal of previously accrued compensation expenses.

**Credit-related expenses**, consisting of provision for credit losses and real estate owned (REO) operations expense, were $912 million for the fourth quarter, compared to $1.4 billion for the third quarter. The provision for credit losses in the third and fourth quarter included amounts related to increased estimates of incurred losses on mortgage loans associated with higher default rates, an observed increase in delinquency rates and increases in severity of losses on a per-property basis, driven in part by the declines in home sales and home prices. The company expects credit-related expenses to remain high relative to recent periods and to vary from period to period as the U.S. housing market remains under pressure.

Total credit losses, consisting of net charge-offs plus REO operations expense, were $236 million for the fourth quarter, $126 million for the third quarter and $499 million for the full-year 2007. Realized credit losses were an annualized 5.4 basis points, 3.0 basis points and 3.0 basis points of the average total mortgage portfolio for the fourth quarter, the third quarter and full-year 2007, respectively. *The company expects total credit losses to increase in 2008.*

*In addition, as a result of the continuing deterioration in the U.S. housing market, the company has revised its estimate of total credit losses for 2008 and 2009 to $2.2 billion and $2.9 billion, respectively.*

**Other non-interest expense** for the fourth quarter was $2.1 billion, compared to $1.2 billion for the third quarter. Fourth quarter non-interest expense included losses on certain credit guarantees of $1.3 billion, compared to $392 million for the third quarter, primarily related to higher expected future credit costs reflected in the market-based valuations of the guarantee obligation associated with newly-issued PCs. The company expects that price increases, including the delivery fee increase effective in March 2008, may mitigate a portion of the losses on certain credit guarantees.

Also included in other non-interest expense for the fourth quarter were losses of $736 million on loans purchased out of PC pools, compared to losses of $649 million in the third quarter, largely due to a decline in the estimated fair value and an increase in the average unpaid principal balance per loan of non-performing loans purchased out of PC pools. The company announced in December 2007 certain operational changes for purchasing delinquent loans from PC pools. This action is expected to reduce the losses on loans purchased out of PC pools and result in a higher provision

for credit losses associated with our PCs and Structured Securities.

During the fourth quarter, the company recognized $273 million in other non-interest income associated with the recapture of previously recognized market value losses on purchased loans due to either borrower payoffs or property fair values upon foreclosure that exceeded the carrying basis of the loan.

<center>*     *     *</center>

## Core Capital

Estimated regulatory core capital was $37.9 billion at December 31, 2007, which represented an estimated $11.4 billion in excess of the company's regulatory minimum capital requirement, and an estimated $3.5 billion in excess of the 30 percent mandatory target capital surplus directed by the Office of Federal Housing Enterprise Oversight (OFHEO).

In order to manage to the 30 percent mandatory target capital surplus and improve business flexibility, during the fourth quarter of 2007, the company issued $6.0 billion of non-cumulative, perpetual preferred stock, reduced its common dividend by 50 percent and reduced the size of its cash and investments portfolio.

<center>*     *     *</center>

## Fair Value of Net Assets

The company's attribution of changes in fair value relies on models, assumptions, and other measurement techniques that evolve over time.

*At December 31, 2007, the fair value of net assets was $12.6 billion, reflecting a net after-tax reduction of $19.2 billion from the December 31, 2006 level of $31.8 billion.* This change in fair value of net assets reflects the impact of net cash flows received from guarantee activities; core spread income received from investment activities; the payment of preferred and common stock dividends; other capital transactions, including the issuance of $6 billion in preferred stock during the fourth quarter of 2007; and changes in fair value of assets and liabilities managed in the company's underlying businesses.

The company estimates that wider net mortgage-to-debt OAS resulted in a pre-tax reduction in fair value of $23.8 billion for the year ended December 31, 2007. In addition, the company estimates that a change in fair value of the net single-family

<center>77</center>

guarantee asset and obligation resulted in a pre-tax reduction of $20.1 billion for the year ended December 31, 2007.

<div align="center">*     *     *</div>

**Internal Controls**

Remediation of the known material weaknesses and significant deficiencies in Freddie Mac's financial reporting process was a top corporate priority during 2007 and continues into 2008. The company believes the measures it has implemented during 2007 to remediate the material weaknesses in internal control over financial reporting have had a positive impact on its internal control over financial reporting. From January 1, 2007 to date, the company has:

- Designed and implemented the controls it believes are necessary to remediate all known material weaknesses;

- Remediated, through demonstration of the operating effectiveness of the controls implemented by the company, material weaknesses around adequacy of staffing; IT general controls over access to data, security administration and change management, but identified certain new significant deficiencies in IT general controls in connection with testing the controls implemented by the company;

- Implemented new financial accounting applications for guarantee asset valuation in the fourth quarter of 2007 and for the company's entire mortgage-related securities portfolio and credit guarantees as of January 1, 2008;

- Made several changes in its accounting policies that simplified its accounting processes (see "NOTE 20: CHANGES IN ACCOUNTING PRINCIPLES" to the company's consolidated financial statements of its Information Statement and Annual Report dated February 28, 2008 for additional information on the company's accounting changes); and

- Substantially completed the business process design review through which the company assessed significant risks to the business processes that are important to its financial reporting process, identified the controls to mitigate those risks, and identified for remediation any deficiencies in the design of those controls.

93.    In spite of defendant Syron's suggestion in the preceding press release that

Freddie Mac's financial woes were the result of the Company simply living up to its obligations in a crisis that was not of its making, it is quite clear that Freddie Mac's aggressive acquisition of subprime mortgages over a multi-year period marked by debilitating internal control deficiencies at the Company was the fault of the Individual Defendants, who caused massive damages to the Company by breaching their fiduciary duties.   Moreover, the enhanced financial reporting policies and accounting policies trumpeted by defendant Piszel were too little and far too late, especially considering the Individual Defendants' knowledge of the Company's internal control deficiencies dating back to at least 2003.

94.     The Individual Defendants can no longer deny their shortcomings, as on May 22, 2008, in testimony before the Committee on Financial Services of the United States House of Representatives, defendant Cook ostensibly admitted that Freddie Mac had employed lax and substandard credit standards with respect to new mortgage originations.   Specifically, Cook stated:

> I would also like to say a word about the price and credit quality of new mortgage originations, which I know has raised some concerns.  To guard against the problems that led to the current crisis, in which risk was often seriously under-priced, almost every mortgage lender – not just the GSEs – has tightened credit standards and raised prices to better reflect the risks of lending mortgage money in uncertain times.

95.     Following Cook's testimony to Congress, in June and July of 2008, Freddie Mac's financial position deteriorated even further.

96.     On July 11, 2008, in a New York Times article entitled "U.S. Weighs Takeover of Two Mortgage Giants," the unthinkable was suggested - that Freddie Mac would be placed in conservatorship by the federal government:

> ***Alarmed by the growing financial stress at the nation's two largest mortgage finance companies, senior Bush administration officials are considering a plan to have the government take over***

*one or both of the companies and place them in a
conservatorship if their problems worsen, people briefed about
the plan said on Thursday.*

The companies, Fannie Mae and Freddie Mac, have been hit hard
by the mortgage foreclosure crisis. Their shares are plummeting
and their borrowing costs are rising as investors worry that the
companies will suffer losses far larger than the $11 billion they
have already lost in recent months. Now, as housing prices decline
further and foreclosures grow, the markets are worried that Fannie
and Freddie themselves may default on their debt.

*Under a conservatorship, the shares of Fannie and Freddie
would be worth little or nothing, and any losses on mortgages
they own or guarantee — which could be staggering — would be
paid by taxpayers.*

<div align="center">*     *     *</div>

Under a 1992 law, Fannie or Freddie could be put into
conservatorship if their top regulator found that either one is
"critically undercapitalized." A conservator would have sweeping
powers to overhaul them, but would not have the authority to close
them.

*The markets showed fresh signs on Thursday of being nervous
about the future of the companies. Their stock prices continued
a weeklong slide, hitting their lowest level in 17 years. The debt
markets, meanwhile, pushed up the two companies' cost of
borrowing — their lifeblood for buying mortgages.*

The companies are by far the biggest providers of financing for
domestic home loans. If they are unable to borrow, they will not
be able to buy mortgages from commercial lenders. In turn, that
would make it more expensive and difficult, if not impossible, for
home buyers to obtain credit, freezing the United States housing
market. Even healthy banks are reluctant to tie up scarce capital
by offering mortgages to low-risk home buyers without Fannie and
Freddie taking the loans off their books.

Together the two companies touch more than half of the nation's
$12 trillion in mortgages by either owning them or backing them.
They hold more than $1.5 trillion of the mortgages as securities.
Others are sold to investors in the form of mortgage-backed bonds.

*In recent weeks, the companies have spiraled downward,
undermined by declining confidence in their future and shaken
by sharp declines in their assets as the housing markets have*

*continued to slide and foreclosures have risen.*

*In the last week alone, Freddie has lost 45 percent of its value*, and Fannie is off 30 percent. Expectations of default at the companies have also risen; it costs three times as much today to buy insurance on a two-year Fannie bond as it did three years ago.

*Analysts expect the companies to announce a new round of write-downs and possibly be forced to raise capital by issuing additional shares, which would dilute their value for current shareholders.*

Despite repeated assurances from regulators about the financial soundness of the two institutions, financial markets have concluded that by some measures they are deeply troubled.

*Freddie, for instance, is technically insolvent under fair value accounting rules, in which the company puts a market value on assets as if it had to sell them now.*

Although Treasury Secretary Henry M. Paulson Jr. and Ben S. Bernanke, the chairman of the Federal Reserve, passed up invitations by lawmakers on Thursday to seek legislation to deal with the crisis, officials said that the administration had been privately considering a government takeover should the markets continue to turn against the companies.

\*     \*     \*

Despite repeated denials by officials in the Bush and prior administrations, financial markets have long assumed the government would stand behind Fannie Mae and Freddie Mac in times of difficulty, both because they are integral to the housing and financial markets and because the companies have a line of credit to the Treasury.

But Congress set that credit more than 38 years ago, long before the companies rose to such size and prominence, and its limit, $2.25 billion for each, has become a tiny fraction of the companies' overall debt.

Some analysts have begun to propose that the Fed also permit the two companies to borrow from it, as Wall Street investment banks began doing after the rescue of Bear Stearns. But there is no indication that the Fed is contemplating such a move.

*On Thursday, the rapid sell-off of shares of Fannie Mae and Freddie Mac came after a former central banker made comments*

*that the companies might not be solvent, and an analyst at UBS issued a report critical of Freddie Mac.*

The turmoil also shook the debt of the companies, with one main measure indicating that their cost of borrowing has risen to the highest level since mid-March, when the government rescued Bear Stearns. Throughout the day, senior officials sought to reassure the markets about the financial health of Fannie and Freddie.

\* \* \*

*Shares of Freddie Mac plunged more than 30 percent and Fannie Mae's more than 20 percent in the first hour of trading on Thursday. By the close of trading, Fannie shares had fallen nearly 14 percent, and Freddie shares had dropped 22 percent. It was the second straight day of declines for the companies.*

97. On July 11, 2008, Freddie Mac's share price fell as low as $3.89, closing for the day at $7.75 per share. Two trading days later on July 15, 2008, Freddie Mac stock closed at a price of $5.26 per share. This precipitous decline represents a 92% reduction in value of the Company's stock price since June 5, 2007, when 15 of the Individual Defendants (as described in detail below) sold 37,529 shares of Freddie Mac stock, at a price of $66.94 per share, garnering proceeds of $2,494,117.46.

98. Then, on July 18, 2008, the Wall Street Journal, in an article entitled "Mortgage Giant Freddie Mac Considers Major Stock Sale," reported that Freddie Mac was considering another sale of new shares of Freddie Mac stock, this time for $10 billion, in an effort to avoid a government bailout that would likely entail greater regulation of the Company. Specifically, the article stated, in relevant part:

*Mortgage giant Freddie Mac* -- emboldened by emergency regulatory actions that have triggered a two-day rebound in its battered stock -- *is considering raising capital by selling as much as $10 billion in new shares to investors, according to people familiar with the matter.*

The selling of new shares would have the potential to avoid a full-blown government rescue for Freddie Mac and Fannie Mae, twin

keystones of the U.S. housing market. The publicly traded, government-sponsored companies own or guarantee about $5.2 trillion of home mortgages, or nearly half the total outstanding, and are at the center of government efforts to prop up the sagging housing market.

Shares of Freddie were up $1.19, or 14%, to $9.52 in midday trading Friday on the New York Stock Exchange.

**Freddie Makes Step Friday**

*In the latest development, Freddie filed a form with the Securities and Exchange Commission Friday morning that marks a final step toward registering its common stock with the agency. The filing of a Form 10 registration statement indicates that the shares could be registered as early as today.*

\*       \*       \*

In 2002, after years of fighting off the idea, Freddie and Fannie had agreed to register their common stock with the SEC and subject themselves to that agency's filing requirements like normal corporations. Fannie met the registration requirements in 2003. Freddie was delayed by the need to overhaul its books and internal risk controls after findings in 2003 that it violated accounting rules.

**Worries About Mortgage Losses**

*Both companies' stock fell about 45% last week amid worry about whether they have enough capital to cover mortgage losses. The depth of their troubles spurred the Treasury Department on Sunday to unveil an unusual plan to temporarily extend an unspecified credit line to both companies -- as well as buy stock in them if necessary.*

That plan quickly came under fire on Capitol Hill. Critics argue it could cost American taxpayers billions of dollars.

*For its part, Freddie would like to avoid the stricter government oversight that could accompany any rescue. Its moves come as new details emerge about its recent stumbles.*

The past two days have raised hopes at Freddie for a sale of shares to investors other than the Treasury. Freddie and Fannie shares both surged more than 29% on Wednesday, a day after the Securities and Exchange Commission set emergency rules limiting the ability of bearish investors to place aggressive bets that their stocks would keep falling.

A sale by Freddie of common and preferred stock could be tough to pull off. For starters, the preferred shares would require Freddie to offer a very high rate of return to attract buyers. The yield on one existing issue of Freddie's preferred stock, for example, is about 13.8%.

At that rate, even a $5 billion preferred-stock offering would entail a $690 million annual payout, on top of the $272 million Freddie paid out on its existing preferred shares in the first quarter. That would reduce the money available to common-stock shareholders, cutting the value of those holdings and potentially sending the stock price lower.

The main buyers for any new-stock issues are likely to be existing shareholders world-wide, according to one person involved in the discussion, adding that a definitive plan hasn't yet been determined.

In the short term, a sale of new shares might eliminate the need for the Treasury's help, but a government bailout might still be required later. "At the heart of this crisis of confidence is uncertainty about the true financial condition of the companies," says Armando Falcon Jr., their former regulator.

Analysts expect that Freddie and Fannie both will face significant losses in the months ahead as the housing crisis shows no signs of slowing. Both companies, which were originally chartered by acts of Congress, buy mortgages from lenders. They package those loans into securities for their own investment portfolios and for sale to investors world-wide.

The two companies -- which are rivals in the same business -- have reported a combined $11 billion of losses over the past three quarters, largely because of increasing defaults by homeowners on mortgages. When homeowners don't make mortgage payments, Fannie and Freddie must reimburse the holders of securities backed by those defaulting mortgages. At the same time, falling home prices cut the value of the collateral backing the loans, increasing losses for Fannie and Freddie.

Investors and analysts can only guess how bad the losses might be as several million American homes go through foreclosure. *Analysts at Goldman Sachs Group Inc. this week estimated that Fannie faces default-related losses of $32 billion and Freddie $21 billion*. Those losses, expected to be mostly realized over the next few years, will be offset to some extent by growing revenues and higher fees the companies can now charge.

Freddie's board met Thursday to review options for selling new shares. Freddie Mac Chief Executive Officer Richard Syron has huddled frequently with investment bankers from Morgan Stanley and Goldman Sachs Group Inc. and has held two board meetings this week at Freddie's New York office. The proceeds of a sale are expected to be in the range of $5 billion to $10 billion, according to people close to the discussions.

One idea that has been raised is a "rights offering" of shares, in which existing shareholders get first dibs on the new stock. *Freddie, for its part, says it has plenty of cash for now and has hinted that it could resort to eliminating its dividend, for savings of $650 million a year.*

In an interview, Mr. Syron said Freddie's board has been discussing "the full array of options before us," declining to give specifics. He said it was too early to specify when Freddie would raise capital, adding: "We're not at the stage of talking about the exact when."

*The push to court private investors, rather than accept government money, illustrates how much Freddie Mac wants to avoid the potential for additional government controls. Congressional approval of a government bailout would likely entail new restraints on how it conducts business.*

For instance, if loans or investments are made with government money, lawmakers are weighing provisions to prevent the two companies from paying dividends to shareholders or issuing big paychecks to their management, says Rep. Barney Frank (D., Mass.), chairman of the House Financial Services Committee. Government assistance could require Fannie and Freddie to consult the government "before it can even pay its water bill for the toilet," Rep. Frank said in an interview. He supports what the Treasury has proposed, which is to provide money for the two companies if needed.

Mr. Syron said he hopes he won't need the government's help, or face the possible consequences, such as getting bills approved by the federal government. "I'm kind of partial to indoor plumbing," he quipped during an interview, in response to Rep. Frank's comment.

The discussions come as both Freddie and its bigger rival, Fannie, continue to struggle to balance their shareholders' desire for big profits and the government's demand that they provide plenty of funding for home loans, even if that hurts their profits in the short

term.

\*     \*     \*

The government's proposal to offer a rescue if needed means that, for the time being, Freddie and Fannie are effectively wards of the state. As a result, taxpayers would pay the bill if either company were to fall apart.

**Growth at a Dizzying Pace**

The seeds of the companies' capital questions were sown in 1992. Lobbyists from Fannie and Freddie persuaded Congress they didn't need to hold much capital as a cushion against homeowner defaults, which were expected to be small.

Fannie and Freddie grew at a dizzying pace, raising their combined holdings of mortgages to $1.58 trillion in 2003 from $136 billion in 1990. They dominated their industry, providing funding or guarantees for 57% of all U.S. home mortgages in 2003, according to Inside Mortgage Finance, a trade publication.

*That control weakened a few years back amid accounting irregularities at Fannie and Freddie and aggressive lending by other financial firms, particularly in "subprime" and other risky mortgages to low-end borrowers. Eager to regain market share, Fannie and Freddie started buying riskier mortgages themselves.*

Still, when the credit crunch hit last year, Fannie and Freddie appeared to be in relatively good shape. They had avoided some of the worst lending practices, and their Wall Street rivals were on the ropes. The companies' market share shot up to 68% in this year's first quarter from 45% a year earlier.

As rivals faltered, Freddie last autumn put a note on its Web site titled "Shelter in a Storm," declaring: "Even when other lenders stop lending, we continue to provide a steady source of home funding."

But it turned out that Fannie and Freddie weren't safe from that storm. *They stunned investors by reporting combined losses of about $3.5 billion in the third quarter of last year.*

That cut deeply into the small amounts of capital held by Fannie and Freddie. Late last year, Fannie and Freddie scrambled to shore up their capital by selling a combined $13 billion of preferred shares. Selling those shares meant a big chunk of future profits would go to the preferred holders rather than the owners of

common shares.

At an investor conference in December, Mr. Syron apologized to Freddie's holders of common shares: "We wanted to dilute common shareholders like we wanted to shoot ourselves in the head with a gun," he said.

The companies reported further losses in the following quarters. Treasury Secretary Henry Paulson and Fed Chairman Ben Bernanke began publicly exhorting them and other big financial companies to raise more capital, as quickly as possible, to cope with the avalanche of foreclosures ahead.

<p style="text-align:center">*      *      *</p>

Freddie promised to raise $5.5 billion of its own. "It's better to go fast than slow," Freddie's chief financial officer, Buddy Piszel, urged Mr. Syron.

The company didn't move quickly enough. Fears about the mortgage giants reignited July 7, when Lehman analyst Bruce Harting released a report saying Freddie and Fannie might need to raise a combined $75 billion under a proposed accounting rule.

Even though it's unlikely the rule would even apply to the firm, investors began selling the shares of Freddie and Fannie. Others engaged in "short sales," or bets that the shares would decline. Both companies' shares went into a dive.

*As of March 31, Freddie had "core capital" -- a measure of financial strength consisting of retained earnings and other items -- totaling $38.3 billion. That works out to 1.8% of the $2.15 trillion of mortgages Freddie owned or guaranteed as of that date.*

*That's low compared with the requirements placed on other financial institutions, such as banks. Indeed, if Freddie were a bank, it would need about $91 billion to be considered well-capitalized*, says Karen Petrou, managing partner at research firm Federal Financial Analytics in Washington.  Her firm does consulting work for trade associations that are sometimes publicly critical of Fannie and Freddie.

99.     As described in detain herein, the Individual Defendants violated their fiduciary

duties to the Company by knowingly failing to implement adequate internal controls and making

false and misleading statements and/or material omissions.  As a result, Freddie Mac has suffered

<p style="text-align:center">87</p>

billions of dollars in damages, and despite Plaintiffs' demands for action against those responsible, Freddie Mac's Board has not initiated any action.

### The Individual Defendants' Insider Selling

100.    From March 1, 2006 to December 31, 2007, during the height of the sub-prime crisis, defendants Syron, Bostrom, Cook, Die, Egan, George, May, McLoughlin, Mullings, Piszel, Saksena, Weiss, Boyd, McQuade, Poe, Smialowski and Tsien (collectively, the "Insider Selling Defendants"), while in possession of materially adverse non-public information regarding the Company's exposure to sub-prime mortgages and lack of adequate internal controls and procedures, sold more than $13.5 million in Freddie Mac stock on the basis of their knowledge of the preceding materially adverse non-public information, as demonstrated below:

| Defendant | Date | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|---|
| Syron | June 5, 2007 | 12,742 | $66.94 | $852,949.48 |
| | May 6, 2007 | 8,193 | $66.31 | $543,277.83 |
| | April 1, 2007 | 7,979 | $59.49 | $474,670.71 |
| | December 31, 2006 | 21,249 | $67.90 | $1,442,807.10 |
| | May 6, 2006 | 7,860 | $61.98 | $487,162.80 |
| | April 1, 2006 | 7,637 | $61.92 | $472,883.04 |
| **Total** | | **65,660** | | **$4,273,750.96** |
| | | | | |
| Bostrom | June 5, 2007 | 1,160 | $66.94 | $77,650.40 |
| | March 3, 2007 | 967 | $62.19 | $60,137.73 |
| **Total** | | **2,127** | | **$137,778.13** |
| | | | | |
| Cook | August 2, 2007 | 1,748 | $56.61 | $98,954.28 |
| | August 2, 2007 | 1,933 | $56.61 | $109,427.13 |
| | June 5, 2007 | 4,109 | $66.94 | $275,056.46 |
| | May 6, 2007 | 1,993 | $66.31 | $132,155.83 |
| | January 3, 2007 | 4,258 | $68.20 | $290,395.60 |
| | January 3, 2007 | 2,874 | $68.20 | $196,006.80 |
| | August 2, 2006 | 1,759 | $57.50 | $101,142.50 |
| | August 2, 2006 | 1,946 | $57.50 | $111,895.00 |

|  | May 6, 2006 | 1,565 | $61.98 | $96,998.70 |
|---|---|---|---|---|
| **Total** |  | **22,185** |  | **$1,412,032.30** |
|  |  |  |  |  |
| Die | June 19, 2007 | 2,207 | $63.51 | $140,166.57 |
|  | June 5, 2007 | 273 | $66.94 | $18,274.62 |
|  | May 4, 2007 | 777 | $66.31 | $51,522.87 |
| **Total** |  | **3,257** |  | **$163,594.06** |
|  |  |  |  |  |
| Egan | June 5, 2007 | 250 | $66.94 | $16,735.00 |
|  | May 4, 2007 | 181 | $66.31 | $12,002.11 |
| **Total** |  | **431** |  | **$28,737.11** |
|  |  |  |  |  |
| George | August 22, 2007 | 1,670 | $64.89 | $108,366.30 |
|  | June 5, 2007 | 1,510 | $66.94 | $101,079.40 |
|  | August 22, 2006 | 1,444 | $61.39 | $88,647.16 |
| **Total** |  | **4,624** |  | **$298,092.86** |
|  |  |  |  |  |
| May | December 31, 2007 | 1,722 | $34.07 | $58,668.54 |
|  | June 5, 2007 | 810 | $66.94 | $54,221.40 |
|  | April 11, 2007 | 446 | $60.26 | $26,875.96 |
|  | April 1, 2007 | 434 | $59.49 | $25,818.66 |
|  | March 1, 2007 | 584 | $63.49 | $37,078.16 |
|  | September 25, 2006 | 5,500 | $65.00 | $357,500.00 |
|  | August 24, 2006 | 5,000 | $62.00 | $310,000.00 |
|  | August 24, 2006 | 5,000 | $63.50 | $317,500.00 |
|  | April 11, 2006 | 446 | $59.44 | $26,510.24 |
|  | April 1, 2006 | 435 | $61.92 | $26,935.20 |
|  | March 2, 2006 | 444 | $67.06 | $29,774.64 |
| **Total** |  | **20,821** |  | **$1,270,882.80** |
|  |  |  |  |  |
| McLoughlin | June 5, 2007 | 1,087 | $66.94 | $72,763.78 |
|  | May 6, 2007 | 466 | $66.31 | $30,900.46 |
|  | April 1, 2007 | 199 | $59.49 | $11,838.51 |
|  | May 6, 2006 | 470 | $61.98 | $29,130.60 |
|  | April 1, 2006 | 201 | $61.92 | $12,445.92 |
| **Total** |  | **2,423** |  | **$157,079.27** |
|  |  |  |  |  |
| Mullings | July 26, 2007 | 2,482 | $59.39 | $147,405.98 |
|  | June 5, 2007 | 720 | $66.94 | $48,196.80 |
|  | July 26, 2006 | 2,482 | $57.65 | $143,087.30 |

| | | | | |
|---|---|---|---|---|
| **Total** | | **5,684** | | **$338,690.08** |
| | | | | |
| Piszel | December 7, 2007 | **8,234** | $35.54 | **$292,636.36** |
| | | | | |
| Saksena | June 5, 2007 | **555** | $66.94 | **$37,151.70** |
| | | | | |
| Weiss | December 31, 2007 | 854 | $34.07 | $29,095.78 |
| | June 5, 2007 | 444 | $66.94 | $29,721.36 |
| | May 6, 2007 | 214 | $66.31 | $14,190.34 |
| | April 1, 2007 | 182 | $59.49 | $10,827.18 |
| | November 26, 2006 | 594 | $67.45 | $40,065.30 |
| | May 6, 2006 | 214 | $61.98 | $13,263.72 |
| | April 1, 2006 | 189 | $61.92 | $11,702.88 |
| **Total** | | **2,691** | | **$148,866.56** |
| | | | | |
| Boyd | December 11, 2007 | 607 | $32.96 | $20,006.72 |
| | June 5, 2007 | 355 | $66.94 | $23,763.70 |
| | May 6, 2007 | 381 | $66.31 | $25,264.11 |
| | April 1, 2007 | 767 | $59.49 | $45,628.83 |
| | May 6, 2006 | 381 | $61.98 | $23,614.38 |
| | April 1, 2006 | 740 | $61.92 | $45,820.80 |
| **Total** | | **3,231** | | **$184,098.54** |
| | | | | |
| McQuade | September 1, 2007 | 13,419 | $61.61 | $826,744.59 |
| | June 5, 2007 | 9,290 | $66.94 | $621,872.60 |
| | May 6, 2007 | 5,977 | $66.31 | $396,334.87 |
| | September 1, 2006 | 14,037 | $63.61 | $892,893.57 |
| | May 6, 2006 | 4,786 | $61.89 | $296,205.54 |
| **Total** | | **47,509** | | **$3,034,051.17** |
| | | | | |
| Poe | June 1, 2007 | 2,000 | $66.98 | $133,960.00 |
| | May 1, 2007 | 2,000 | $65.31 | $130,620.00 |
| | April 10, 2007 | 2,000 | $60.00 | $120,000.00 |
| | April 4, 2007 | 5,292 | $59.19 | $313,233.48 |
| | March 1, 2007 | 2,000 | $63.44 | $126,880.00 |
| | February 1, 2007 | 2,000 | $65.25 | $130,500.00 |
| | January 16, 2007 | 2,000 | $64.92 | $129,840.00 |
| | April 26, 2006 | 3,303 | $60.49 | $199,798.47 |
| **Total** | | **20,595** | | **$1,284,831.95** |
| | | | | |

| Smialowski | June 5, 2007 | 3,622 | $66.94 | $242,456.68 |
|---|---|---|---|---|
| | May 6, 2007 | 1,397 | $66.31 | $92,635.07 |
| | December 13, 2006 | 1,656 | $69.11 | $114,446.16 |
| | May 6, 2006 | 1,066 | $61.98 | $66,070.68 |
| **Total** | | **7,741** | | **$515,608.59** |
| | | | | |
| Tsien | June 5, 2007 | 332 | $66.94 | $22,224.08 |
| | May 6, 2007 | 214 | $66.31 | $14,190.34 |
| | April 1, 2007 | 208 | $59.49 | $12,373.92 |
| | May 6, 2006 | 214 | $61.98 | $13,263.72 |
| | April 1, 2006 | 208 | $61.92 | $12,879.36 |
| **Total** | | **1,176** | | **$74,931.42** |
| | | | | |
| **TOTALS** | | **218,944** | | **$13,652,813.86** |

101.    The Company's prohibition on the use of inside information as contained in the

Company's Code of Conduct, clearly demonstrates that the Insider Selling Defendants stock

sales described in paragraph 100 were in violation of Freddie Mac's corporate policy:

**A. Inside Information**

The use of inside, or non-public, material information in connection with the purchase or sale of Freddie Mac securities, including its debt and mortgage-related securities or another's securities, is unethical and is generally prohibited by law. Non-public material information includes information about Freddie Mac or another company that is obtained by virtue of your service on Freddie Mac's Board, which has not been effectively disclosed to the general public, and which could, if known, affect a reasonable investor's decision to buy or sell the securities of Freddie Mac or the other company. Rules pertaining to "insider trading" are set forth in Corporate Policy 7-145, Insider Trading and Related Conduct.

These rules apply both to trading in Freddie Mac securities, including mortgage-related and debt securities, for your own account and to causing another person or entity to trade our securities on behalf of that person or entity. In particular, these rules apply to the purchase and sale of Freddie Mac's securities and to the possession of non-public information with respect to those securities. Accordingly, corporate policy prohibits conduct by any Director that could result in, or appear to be the result of, insider trading in Freddie Mac securities. You must comply with this general prohibition and with specific provisions of applicable corporate policy.

## DERIVATIVE AND DEMAND ALLEGATIONS

102.    Plaintiffs bring this action derivatively in the right and for the benefit of Freddie Mac to redress breaches of fiduciary duties, unjust enrichment, and other violations of law by the Individual Defendants.

103.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

104.    Plaintiffs are shareholders of Freddie Mac, were shareholders of Freddie Mac at the time of the wrongdoing alleged herein, and have been shareholders of Freddie Mac continuously since that time.

105.    On March 26, 2008, plaintiffs made a demand (the "Demand") on the Board to commence an action against the Individual Defendants.  A copy of the Demand is attached hereto, and incorporated by reference herein, as Exhibit A.

106.    The Demand stated, among other things, that "[i]f within a reasonable period of time after receipt of this letter the Board has not taken action as demanded herein, the Stockholders will commence a shareholder derivative action on behalf of the Company seeking appropriate relief."

107.    By letter dated March 28, 2008, defendant and General Counsel of the Company Robert E. Bostrom informed plaintiffs that the Board had formed a "special committee" to investigate allegations similar to those made in the Demand and that plaintiff would be notified "when the investigation is complete and the Board has determined whether to initiate legal action on behalf of the Company."  A copy of the March 28, 2008 letter is attached hereto, and incorporated by reference herein, as Exhibit B.

108.    As of the filing of this Complaint, neither the Board nor any representative of the

Board has further responded to the Demand in any way. Upon information and belief, and as indicated in Freddie Mac's public filings, neither the Board nor the Special Committee has taken any action as demanded by plaintiffs to remedy the damages caused to Freddie Mac as a result of the Individual Defendants' breaches of their fiduciary duties.

<u>COUNT I</u>

**Against the Individual Defendants for<br>Breach of Fiduciary Duty<br>(Internal Controls and False Statements)**

109.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

110.   As alleged in detail herein, the Individual Defendants had a fiduciary duty to, among other things, refrain from making false and misleading statements to the Company's shareholders and exercise good faith in maintaining adequate internal controls and reviewing the preparation of the Company's financial statements and ensuring they were prepared in compliance with GAAP.

111.   As alleged in detail herein, the Individual Defendants breached their fiduciary duties by making false and misleading statements to the market and shareholders in the Company's press releases and SEC filings and failing to exercise good faith in maintaining adequate internal controls and reviewing the Company's financial statements and ensuring they were prepared in compliance with GAAP.

112.   The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment.

113.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Freddie Mac has sustained damages, as alleged herein.

## COUNT II

### Against the Insider Selling Defendants for
### Breach of Fiduciary Duty
### (Insider Selling)

114.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

115.   At the time of each of the stock sales set forth herein, each of the Individual Defendants knew, but did not disclose publicly, the material information described herein.  Each of the Insider Selling Defendants made each of the stock sales alleged in paragraph 100 on the basis of and because of their knowledge of the material non-public information described herein.

116.   At the time of their stock sales, each of the Insider Selling Defendants knew that when the material information described herein was publicly disclosed, the price of the Company's common stock would dramatically decrease.  The Insider Selling Defendants' sales of Freddie Mac common stock based on their knowledge of this material non-public information were a breach of their fiduciary duties of loyalty and good faith.

117.   Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any proceeds the Insider Selling Defendants obtained thereby.

## COUNT III

### Against the Insider Selling Defendants for
### Unjust Enrichment

118.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

119.   The Insider Selling Defendants were unjustly enriched by their receipt of

proceeds from their illegal sales of Freddie Mac common stock, as alleged herein, and it would be unconscionable to allow them to retain the benefits of their illegal conduct.

120.    To remedy the Insider Selling Defendants unjust enrichment, the Court should order them to disgorge to the Company all proceeds derived from their illegal sales of Freddie Mac common stock.

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Imposing a constructive trust in favor of the Company for the amount of proceeds each of the Insider Selling Defendants received from their sales of Freddie Mac common stock alleged herein;

B.    Awarding the Company the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.    Granting appropriate equitable relief to remedy defendants' breaches of fiduciary duties;

D.    Ordering the Insider Selling Defendants to disgorge to the Company all proceeds derived from their sales of Freddie Mac common stock alleged herein;

E.    Awarding to plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: July 24, 2008

Respectfully submitted,

Mark Hanna
Virginia Bar # 45442
Attorney for Plaintiffs
Davis, Cowell & Bowe LLP

1701 K Street NW, Suite 210
Washington, DC 20006
(202) 223-2620
(202) 223-8651 (fax)
mhanna@dcbwash.com

Eric L. Zagar
Michael C. Wagner
J. Daniel Albert
Pro Hac Petitions Forthcoming
Attorneys for Plaintiffs
Schiffrin Barroway
Topaz & Kessler, LLP
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
ezager@sbtklaw.com
mwagner@sbtklaw.com
dalbert@sbtklaw.com

## VERIFICATION

I, Elna Adams, as Trustee for the Adams Family Trust, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 7/21/08

*Elna Adams*
Elna Adams

**VERIFICATION**

I, Kevin Tashjian, hereby verify that I have authorized the filing of the attached Verified Shareholder Derivative Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

DATE: 7/21/08

Kevin Tashjian